DAVID F. MCDOWELL (CA SBN 125806)
JACOB M. HARPER (CA SBN 259463)
MORRISON & FOERSTER LLP
555 West Fifth Street, Suite 3500
Los Angeles, California  90013-1024
Telephone:  213.892.5200
Facsimile:   213.892.5454
Email:      DMcDowell@mofo.com
            JacobHarper@mofo.com

Attorneys for Defendant
NETFLIX, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DONALD CULLEN, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NETFLIX, INC.,<br><br>Defendant. | Case No.    5:11-cv-01199-EJD<br><br>**DEFENDANT NETFLIX, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT; STATEMENT OF ISSUES; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**[Fed. R. Civ. P. 12(b)(6)]**<br><br>Date:      August 19, 2011<br>Time:      9:00 a.m.<br>Judge:     Hon. Edward J. Davila<br>Courtroom: 1 |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION.................................................................. 1

STATEMENT OF ISSUES………… .................................................................. 3

MEMORANDUM OF POINTS AND AUTHORITIES........................................... 4

I.    INTRODUCTION AND SUMMARY OF ALLEGATIONS ...................... 4

II.   LEGAL STANDARDS ........................................................................... 6

III.  ARGUMENT ......................................................................................... 6

    A.   Cullen Fails to State Claims for Violation of Anti-Discrimination Statutes (the ADA, Unruh Act, and Disabled Persons Act) ..................................................................... 6

        1.   The FCC Has Primary Jurisdiction Over the Critical Issue in Cullen's ADA, Unruh Act, and Disabled Persons Act Claims ......................................................... 7

            a.   Applicable Law ........................................................ 7

            b.   Cullen's Discrimination Claims Easily Satisfy the Four Elements of Primary Jurisdiction ................... 9

                i.   The adequacy of streaming video providers' subtitling is a novel issue requiring resolution.......................................... 9

                ii.   The FCC has "exclusive jurisdiction" to determine adequacy of streaming video closed captioning.................................. 10

                iii.   The 21st Century Act creates a comprehensive regulatory scheme to regulate closed captioning........................ 10

                iv.   The issue requires the expertise of the FCC and uniformity of resolution ................................ 12

        2.   Even the FCC's Without Primary Jurisdiction, the Anti-Discrimination Statutes Do Not Apply.................................... 13

            a.   The ADA does not apply to Netflix's streaming video library, which is not an "actual, physical place.".............................................................. 13

            b.   The Unruh Act and Disabled Persons Act hinder enforcement of, and are thus preempted by, the 21st Century Act .............................................. 15

         3.   Even If the Statutes Apply, Cullen Fails to Allege Facts Showing Discrimination .............................................. 16

    B.   Cullen Fails to State a Claim for Violation of Consumer Protection Statutes (the UCL, FAL, and CLRA)................................ 17

        1.   The Consumer Protection Statutes Do Not Apply .................. 18

1

# TABLE OF CONTENTS

2

Page

3    a. Cullen lacks standing under the UCL, FAL or CLRA because he did not lose money "as a result of" Netflix's actions ...................................................... 18

4

5    b. The CLRA does not apply also because Netflix's streaming videos do not constitute a "tangible" good or service .................................................................. 19

6

7   2. Even If the Consumer Protection Statutes Apply, Cullen Fails to State Viable Claims Under Them ................................. 20

8    a. Cullen fails to state a claim for violation of the UCL's "unlawful" prong ............................................... 20

9     i. Cullen's UCL claim premised on violation of 47 CFR § 79.1 fails because it does not apply to streaming video ...................................... 20

10

11     ii. Cullen's UCL claim premised on his other causes of action fails because they fail ................ 22

12    b. Cullen fails to allege facts showing Netflix made misrepresentations violating the UCL's "unfair" or "fraudulent" prongs, the FAL, or the CLRA ................. 22

13

14     i. Netflix did not promise to subtitle its streaming video library according to Cullen's conception of "meaningful." .................................. 23

15

16     ii. Netflix's alleged "misrepresentations" were not false or misleading ......................................... 23

17 IV. CONCLUSION ........................................................................ 25

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

CASES

4

*Access Now v. Southwest Airlines,*
    227 F. Supp. 2d 1312 (S.D. Fla. 2002) ............................................................. 14

5

*All One God Faith, Inc. v. Hain Celestial Group, Inc.,*
6
    No. C 09-03517, 2009 U.S. Dist. LEXIS 115928
    (N.D. Cal. Dec. 14, 2009) ..................................................................................... 8

7

*Ashcroft v. Iqbal,*
8
    129 S. Ct. 1937 (2009) ......................................................................................... 6

9

*Association to Protect Hammersley v. Taylor Res.,*
    299 F.3d 1007 (9th Cir. 2002) ........................................................................... 13

10

*Bell Atl. v. Twombly,*
11
    550 U.S. 544 (2009) ........................................................................................... 19

12

*Berry v. American Express Publ'g, Inc.,*
    54 Cal. Rptr. 3d 91 (Cal. Ct. App. 2007) ......................................................... 20

13

*Clark v. Time Warner Cable,*
14
    523 F.3d 1110 (9th Cir. 2008) ...............................................................7, 9, 11, 12

15

*Consumer Advocates v. Echostar Satellite Corp.,*
    8 Cal. Rptr. 3d 22 (Cal. Ct. App. 2003) ........................................................... 23

16

*Dastar Corp. v. Twentieth Century Fox Film Corp.,*
17
    539 U.S. 23 (2003) ............................................................................................. 21

18

*Doe v. Wal-Mart Stores, Inc.,*
    572 F.3d 677 (9th Cir. 2009) ............................................................................... 6

19

*Fairbanks v. Super. Ct.,*
20
    205 P.3d 201 (Cal. 2009) ................................................................................... 20

21

*Ferrington v. McAfee, Inc.,*
    No. 10-cv-01455, 2010 U.S. Dist. LEXIS 106600 (N.D. Cal. Oct. 5, 2010) .... 19

22

*Freeman v. Time, Inc.,*
23
    68 F.3d 285 (9th Cir. 1995) ............................................................................... 23

24

*Greene v. T-Mobile USA, Inc.,*
    No. C07-1563, 2008 U.S. Dist. LEXIS 12605 (W.D. Wash. Feb. 7, 2008) ........ 8

25

*Hall v. Time Inc.,*
26
    70 Cal. Rptr. 3d 466 (Cal. Ct. App. 2008) ....................................................... 18

27

*Hoffman v. Cingular Wireless, LLC,*
    No. 06-cv-1021, 2008 U.S. Dist. LEXIS 67573 (S.D. Cal. Sept. 4, 2008) ........ 19

28

# TABLE OF AUTHORITIES

**Page(s)**

*Ingels v. Westwood One Broad. Servs., Inc.*,
  28 Cal. Rptr. 3d 933 (Cal. Ct. App. 2005) ......................................................... 22

*Intel Corp. v. Hamidi*,
  71 P.3d 296 (Cal. 2003).......................................................................................... 19

*Kearns v. Ford Motor Co.*,
  567 F.3d 1120 (9th Cir. 2009) .......................................................................... 6, 23

*Krainski v. State ex rel. Bd. of Regents*,
  616 F.3d 963 (9th Cir. 2010) .................................................................................. 6

*Market Trading v. AT&T Mobility, LLC*,
  388 Fed. Appx. 707 (9th Cir. 2010) ...................................................................... 19

*National Fed'n of the Blind v. Target Corp.*,
  452 F. Supp. 2d 946 (N.D. Cal. 2006)................................................................... 14

*Noah v. AOL Time Warner Inc.*,
  261 F. Supp. 2d 532 (E.D. Va. 2003) .................................................................... 14

*Noah v. AOL Time Warner Inc.*,
  2004 U.S. App. LEXIS 5495 (4th Cir. Mar. 24, 2004) ........................................ 14

*North County Commc'ns Corp. v. California Catalog & Tech.*,
  594 F.3d 1149 (9th Cir. 2010) ............................................................................... 12

*Pantoja v. Countrywide Home Loans, Inc.*,
  640 F. Supp. 2d 1177 (N.D. Cal. 2009)................................................................. 22

*Qwest Corp. v. Arizona Corp. Comm'n*,
  567 F.3d 1109 (9th Cir. 2009) ........................................................................ 15, 16

*Telesaurus VPC, LLC v. Power*,
  623 F.3d 998 (9th Cir. 2010) ................................................................................. 16

*Torres v. AT&T Broadband, LLC*,
  158 F. Supp. 2d 1035 (N.D. Cal. 2001).................................................................. 14

*TRW Inc. v. Andrews*,
  534 U.S. 19 (2001) .................................................................................................. 13

*Turner v. Association of Am. Med. Colleges*,
  85 Cal. Rptr. 3d 94 (Cal. Ct. App. 2008) .............................................................. 17

*United States v. Arizona*,
  No. 10-16645, 2011 U.S. App. LEXIS 7413 (9th Cir. Apr. 11, 2011) ............. 15

*Vess v. Ciba-Geigy Corp. USA*,
  317 F.3d 1097 (9th Cir. 2003)................................................................................... 6

# TABLE OF AUTHORITIES

**Page(s)**

*Weyer v. Twentieth Century Fox Film Corp.*,
  198 F.3d 1104 (9th Cir. 2000) ................................................................. 13, 17

*Wilson v. Marchington*,
  127 F.3d 805 (9th Cir. 1997) ................................................................. 21, 22

*Zulauf v. Kentucky Educ. TV*,
  28 F. Supp. 2d 1022 (E.D. Ky. 1998) ................................................. 8, 9, 10

**STATUTES**

42 USC

  § 12181 ................................................................................................ 13
  § 12182 ................................................................................................ 13
  § 12182(b)(1)(A) ................................................................................... 17

47 USC

  § 414 ................................................................................................... 16
  § 613 ............................................................................................... 7, 20
  § 613(a)(2)(A) .................................................................................. 9, 10
  § 613(c) ................................................................................................ 21
  § 613(c)(2)(A) ................................................................................. 10, 11
  § 613(b) ............................................................................................... 10
  § 613(c)(2)(D) ..................................................................................... 15
  § 613(c)(2)(D)(ii) ............................................................................ 10, 11
  § 613(c)(2)(D)(iii) ............................................................................... 10
  § 613(c)(2)(D)(v) ................................................................................. 10
  § 613(c)(2)(D)(vi) ........................................................................... 10, 11
  § 613(c)(2)(D)(vii) ............................................................................... 11
  § 613(c)(3) .......................................................................................... 11
  § 613(i) ...................................................................................... 7, 10, 21

Cal. Bus. & Prof. Code

  § 17200 ................................................................................................ 18
  § 17204 ................................................................................................ 18
  § 17535 ................................................................................................ 18

Cal. Civ. Code

  § 51 ..................................................................................................... 17
  § 54 ..................................................................................................... 17
  § 1761(a) .............................................................................................. 19
  § 1761(b) .............................................................................................. 10
  § 1770(a) .............................................................................................. 19
  § 1780(a) .............................................................................................. 18

Twenty-First Century Telecommunications and Video Accessibility Act,
  Pub. L. No. 111-260, §§ 201 & 202, 124 Stat. 2751 (2010) ............ 5, 7, 10, 11

# TABLE OF AUTHORITIES

**Page(s)**

**OTHER AUTHORITIES**

47 CFR
§ 79.1 ..................................................................................20, 21, 22
§ 79.1(a)(1)–(3) .......................................................................... 21
§ 79.1(a)–(c) ........................................................................20, 21

Fed. R. Civ. P.
9(b) ...................................................................................... 6, 23
12(b)(6) ............................................................................ 1, 4, 5

Closed Captioning of Video Programming,
62 Fed. Reg. 48487, 48493 (Sept. 16, 1997) .................................. 22

Closed Captioning Requirements for Digital Television Receivers,
65 Fed. Reg. 58,467, 58,467, 58,477 (Sept. 29, 2000) ....................... 21

Senate Science and Transportation's Conference Report,
S. Rep. No. 111-386 (2010) ..................................................... 9, 12

1    **NOTICE OF MOTION AND MOTION**

2           PLEASE TAKE NOTICE that on August 19, 2011, or as soon thereafter as

3    the matter may be heard, in the courtroom of the Honorable Edward J. Davila,

4    United States District Judge, Northern District of California, located at the Robert

5    F. Peckham Federal Building, 280 South First Street, San Jose, California 95113,

6    defendant Netflix, Inc. ("Netflix") will, and hereby does, move to dismiss with

7    prejudice each and every cause of action asserted in the First Amended Complaint

8    ("Complaint") of plaintiff Donald Cullen ("Cullen") pursuant to Federal Rule of

9    Civil Procedure 12(b)(6) because the Complaint fails to state a claim upon which

10   relief can be granted.  Each of the Complaint's nine causes of action, which raise

11   claims under two general theories — (1) anti-discrimination statute violations and

12   (2) consumer protection statute violations — fails for the following reasons:

13   **Causes of Action Raising Anti-Discrimination Statute Violations:**

14          The ***First Cause of Action*** for violation of the Americans with Disabilities

15   Act ("ADA") fails as a matter of law because (1) the FCC has primary jurisdiction

16   under the Twenty-First Century Communications and Video Accessibility Act

17   (sometimes "21st Century Act") to determine the main issue raised by this cause of

18   action, (2) the ADA does not apply here, and (3), even if it did, the Complaint fails

19   to allege facts showing Netflix violated the statute.

20          The ***Eighth Cause of Action*** for violation of California's Unruh Civil Rights

21   Act ("Unruh Act") fails because (1) the FCC has primary jurisdiction under the 21st

22   Century Act to determine the main issue raised by this cause of action; (2) the

23   Unruh Act hinders enforcement of, and is thus preempted by, the 21st Century Act;

24   and (3) even if the Unruh Act applied, the Complaint fails to allege facts showing

25   that Netflix violated it.

26          The ***Ninth Cause of Action*** for violation of California's Disabled Persons

27   Act fails because (1) the FCC has primary jurisdiction under the 21st Century Act

28   to determine the main issue raised by this cause of action; (2) the Disabled Persons

Act hinders enforcement of, and is thus preempted by, the 21st Century Act; and (3) even if the Disabled Persons Act applied, Cullen fails to allege facts showing that Netflix violated it.

**Causes of Action Raising Consumer Protection Statute Violations**:

The **Second Cause of Action** for violation of the California Unfair Competition Law's ("UCL") prohibition on "unfair" business practices, **Third Cause of Action** for violation of the UCL's prohibition on "fraudulent" business practices, and **Fourth Cause of Action** for violation of the UCL's prohibition on "unlawful" business practices all fail because (1) Cullen lacks statutory standing under the UCL by failing to allege Netflix caused any injury; and (2) the Complaint fails to allege facts showing Netflix committed an unfair, fraudulent, or unlawful business practice.

The **Fifth Cause of Action** for violation of California's False Advertising Law fails because (1) Cullen lacks statutory standing under the FAL by failing to allege Netflix caused any injury, and (2) the Complaint fails to allege facts showing Netflix made a false or misleading statement likely to deceive the public.

The **Sixth Cause of Action** for violation of California's Consumer Legal Remedies Act ("CLRA") (seeking injunctive relief and restitution) and **Seventh Cause of Action** for the CLRA (seeking damages) both fail because (1) Cullen lacks standing under the CLRA by failing to allege Netflix caused any injury, (2) Cullen lacks standing because his claims do not involve a "tangible" good or service, and (3) the Complaint fails to allege facts showing Netflix made a false or misleading statement likely to deceive the public.

This Motion is based on this Notice of Motion and Motion, Netflix's Statement of Issues, Netflix's supporting Memorandum of Points and Authorities, and the records in this Action.

## STATEMENT OF ISSUES

***Discrimination-Based Claims*** (1st, 8th, & 9th Causes of Action):

1.    Does primary jurisdiction compel dismissal of ADA, Unruh Act, and Disabled Persons Act claims when Congress gave the FCC exclusive jurisdiction to address captioning of Internet-based streamed video?  (Yes.)

2.    Does Internet-based streaming video found exclusively online, which does not satisfy the Ninth Circuit's settled requirement that ADA claims require an "actual, physical place," fail to state an ADA claim?  (Yes.)

3.    Would a broad grant of injunctive relief under the Unruh Act and Disabled Persons Act, which would ignore the FCC's determination of factors mandated by the 21st Century Act, hinder enforcement of — and thus be preempted by — the 21st Century Act and fail to state claims?  (Yes.)

4.    If a complaint concedes a defendant offered all customers equal access to its streaming videos, does the Complaint fail to state a claim for discrimination under the Unruh Act, Disabled Persons Act, and ADA?  (Yes.)

***Consumer Protection-Based Claims*** (2d–7th Causes of Action):

5.    Does a plaintiff who concedes he did not lose money or property "as a result of" a defendant's conduct, but rather by his own decisions not to stop purchasing a subscription, lack standing to assert claims under the UCL, FAL, and CLRA and fail to state a claim?  (Yes.)

6.    Does Internet-based streaming video fail to qualify as a "tangible" good or service under the CLRA and fail to state a claim under it?  (Yes.)

7.    Do allegations premised on violation of federal regulations or statutes that do not prohibit the alleged conduct fail to state a claim for "unlawful" conduct under the UCL?  (Yes.)

8.    Do UCL, FAL, or CLRA causes of action premised on alleged misrepresentations — whose truth the complaint concedes — fail to state claims?  (Yes.)

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.   INTRODUCTION AND SUMMARY OF ALLEGATIONS.**

3

What happens when an online merchant, with no obligation to do so,

4

voluntarily changes its product content to address customer suggestions?

5

A lawsuit — for not making the changes fast enough.

6

That's what happened to defendant Netflix, which, in 2008, began offering a

7

cheaper, more convenient alternative to its well-known traditional DVD-by-mail

8

video rental service:  an Internet-based streaming video plan with which, for a small

9

fee, customers could view unlimited movies and TV episodes online.  (Compl.

10

¶¶ 6–7, 15–16.)  In response to requests for closed captioning by hearing impaired

11

customers, Netflix began subtitling its streaming videos — though, given the

12

technical difficulties of captioning streaming content, Netflix explained to

13

customers that it could not yet offer subtitles for all its content.  (*Id.* ¶¶ 16, 17, Ex.

14

A at 23.)  Netflix therefore announced that, over several years, it would gradually

15

offer more captioned content to its streaming library as technology permitted.  (*Id.*

16

¶¶ 17, 20, 22, 23, 25.)  Netflix did not set a date-certain for closed captioning its

17

streaming content or promise that it would be able to caption all its content, but

18

Netflix made significant progress in subtitling its videos:  by 2011, it had increased

19

to over 3,500 the total number of subtitled streaming videos and TV episodes (*id.*

20

¶ 27), and upped by *370*% the rate it subtitles those streaming videos (*compare id.*

21

¶ 37 [.64 videos captioned per day since 2008] *with id.* ¶ 36 [2.33 per day today]).

22

Despite Netflix's efforts, plaintiff Cullen, a hearing-impaired Netflix

23

subscriber, filed this class action because, he says, Netflix is not subtitling its

24

streaming video fast enough, or in a manner he subjectively deems sufficiently

25

"meaningful."  (Compl. ¶¶ 33, 33–40.)  Cullen raises two theories and nine causes

26

of action, all of which fail as a matter of law.

27

**Discrimination Theory (1st, 8th, and 9th Causes of Action).**  For his first

28

theory, Cullen alleges Netflix discriminated against hearing impaired individuals by

not captioning its streaming video library at a rate Cullen considers "meaningful"
(in violation of the ADA, Compl. ¶¶ 67–72 [1st Cause of Action ("COA")];
California's Unruh Act, *id.* ¶¶ 109–114 [8th COA]; and California's Disabled
Persons Act, *id.* ¶¶ 115–120 [9th COA]).

    **Consumer Protection Theory (2d–7th Causes of Action).**  Cullen's second
theory asserts Netflix violated consumer protection statutes by violating federal
regulations, and misrepresenting that it would "meaningfully subtitle" its streaming
videos "within a reasonable time period" (in violation of the UCL, Compl. ¶¶ 73–
77 [2d COA, "unfair" prong], ¶¶ 78–82 [3d COA, "fraudulent" prong], ¶¶ 83–92
[4th COA, "unlawful" prong]); FAL, *id.* ¶¶ 93–96 [5th COA]); and CLRA, *id.*
¶¶ 97–101 [6th COA, equitable relief], ¶¶ 102–107 [7th COA, damages].)

    The discrimination claims fail.  ***First***, Cullen's discrimination claims should
be dismissed on primary jurisdiction grounds.  Under the 21st Century Act,
Congress assigned to the FCC the exclusive authority to decide the precise issue
Cullen raises here:  the extent to which Internet-based streaming video providers
must offer closed captioning.  Because Cullen's suit threatens to undermine the 21st
Century Act's framework — which entrusts to the FCC exclusive authority to
provide reasonable captioning regulations that account for the "economic burden"
of implementing captioning — the claims should be dismissed.  ***Second***, even
without primary jurisdiction, the statutes Cullen relies on do not apply:  (a) the
ADA applies only to physical buildings, not to Netflix's non-physical streaming
library; and (b) the Unruh Act and Disabled Persons Act hinder enforcement of, and
are therefore preempted by, the 21st Century Act.  ***Third***, on the merits, all three
causes of action fail because the Complaint does not allege facts showing Netflix
discriminated against hearing-impaired individuals.

    The consumer protection claims also fail.  ***First***, Cullen lacks standing:
(a) all six causes of action fail because he did not lose money (his Netflix
subscription fee) "as a result of" Netflix's wrongdoing — in fact, Cullen continues

to subscribe *regardless of*, not because of, Netflix's continued conduct; and (b) his CLRA claims fail for the additional reason that the Complaint concerns software, not a "tangible" good or service. ***Second,*** regardless of standing, Cullen's claims fail on the merits:  (a) his claim under the "unlawful" prong of the UCL fails because Netflix did not violate any applicable regulations (which the FCC hasn't even drafted yet), or any other statute; and (b) his remaining UCL, FAL and CLRA claims — all premised on misrepresentation — fail because the Complaint fails to assert allegations showing they were not true.

Netflix respectfully requests, therefore, that the Court dismiss the claims with prejudice.

## II.   LEGAL STANDARDS.

To defeat a motion to dismiss, "a complaint must contain sufficient factual matter to state a facially plausible claim for relief." *Krainski v. State ex rel. Bd. of Regents*, 616 F.3d 963, 972 (9th Cir. 2010), citing *Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).  "[C]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Doe v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 683 (9th Cir. 2009).  Where, as here, a plaintiff alleges a "unified course of fraudulent conduct," the complaint must satisfy Rule 9(b)'s particularity requirement and must allege facts demonstrating "who, what, when, where, and how" of the misconduct, *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) — even if fraud is not an element of any cause of action. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103–04 (9th Cir. 2003).

## III.   ARGUMENT.

### A.   Cullen Fails to State Claims for Violation of Anti-Discrimination Statutes (the ADA, Unruh Act, and Disabled Persons Act).

Cullen's first theory asserts that Netflix discriminates against hearing impaired customers by not (yet) offering all its streaming videos with subtitling and thereby (1) rendering the streaming plan "effectively unavailable" to hearing

1   impaired customers by not "meaningfully subtitl[ing]" the streaming videos fast

2   enough (Compl. ¶¶ 33–40, 45) but (2) making the plan available for the same price

3   as for non-hearing impaired customers — "a veritable deaf tax." (Compl. ¶¶ 45,

4   46.)  From these threadbare allegations, Cullen divines that Netflix discriminated

5   against hearing impaired individuals in violation of the ADA, the Unruh Act, and

6   Disabled Persons Act.  All fail as a matter of law.

7   **1.      The FCC Has Primary Jurisdiction Over the Critical
        Issue in Cullen's ADA, Unruh Act, and Disabled
8       Persons Act Claims.**

9   **a.      Applicable Law.**

10   At its core, this action asks the Court to resolve a matter that Congress has

11   explicitly delegated to the FCC under the 21st Century Act, which delegates

12   exclusively to the FCC the authority to decide the precise issue in Cullen's

13   Complaint:  the legal sufficiency of a website's efforts to subtitle its Internet-based

14   streaming video content.  *See* Twenty-First Century Telecommunications and

15   Video Accessibility Act, Pub. L. No. 111-260, §§ 201 & 202, 124 Stat. 2751,

16   codified in part at 47 USC § 613 (2010); *id.* § 613(i) ("The Commission shall have

17   exclusive jurisdiction with respect to any complaint under this section.")

18   As such, dismissal under the primary jurisdiction doctrine is warranted.

19   Under this doctrine, courts dismiss suits in deference to agencies charged with

20   regulating the conduct at issue where, as here, the complaint presents

21   
22   > (1) [a] need to resolve an issue that (2) has been placed
> by Congress within the jurisdiction of an administrative
23  > body having regulatory authority (3) pursuant to a statute
> that subjects an industry or activity to a comprehensive
24  > regulatory authority that (4) requires expertise or
> uniformity in administration.
25

26   *Clark v. Time Warner Cable*, 523 F.3d 1110, 1115–16 (9th Cir. 2008) (dismissing

27   complaint because FCC had primary jurisdiction to consider whether a cable

28   provider violated federal and state law) (internal citations and quotations omitted).

---

1    Cullen's complaint plainly compels dismissal.  *Zulauf v. Kentucky Educ. TV*,

2  28 F. Supp. 2d 1022 (E.D. Ky. 1998), a case virtually identical to this one,

3  dismissed an ADA action alleging a television station discrimination against deaf

4  viewers (as here) "by failing to provide closed captioning for all of its programs."

5  *Id.* at 1023.   In light of the Video Programming Accessibility Act ("VPAA") of

6  1996 (the 21st Century Act's predecessor), which delegated to the FCC authority to

7  promulgate regulations for closed captioning of television programming, the court

8  dismissed the claims in deference to the FCC — largely for the reasons articulated

9  by the Ninth Circuit:  (1) the issue was evidently important enough for Congress to

10  create a specific statutory scheme for it (*i.e.*, the VPAA), *id.* at 1023; (2) FCC had

11  "exclusive jurisdiction" over closed captioning regulations, *id.* at 1024; (3) the

12  VPAA provided a comprehensive scheme "addressing a broadcaster's duty to

13  provide closed captioning for its video programming," *id* at 1023; and (4) "the FCC

14  ha[d] expertise" in broadcasting and captioning and the "VPAA was to promote

15  uniformity," *id.* at 1023.

16    District courts routinely apply the primary jurisdiction doctrine in similar

17  cases.  *E.g.*, *Greene v. T-Mobile USA, Inc.*, No. C07-1563, 2008 U.S. Dist. LEXIS

18  12605, at *4–10 (W.D. Wash. Feb. 7, 2008) (invoking primary jurisdiction to

19  prevent "conflicting decisions" between court and FCC, and preserve uniformity of

20  regulation); *accord All One God Faith, Inc. v. Hain Celestial Group, Inc.*, No. C

21  09-03517, 2009 U.S. Dist. LEXIS 115928, at *24–25 (N.D. Cal. Dec. 14, 2009)

22  (primary jurisdiction prevent courts from "assum[ing] . . . regulatory role"  or

23  "impos[ing] standards" Congress intended agency to apply).

24    For the reasons below, Netflix respectfully requests that the Court dismiss the

25  discrimination claims in deference to the FCC's primary jurisdiction over them.

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

        **b.**     **Cullen's Discrimination Claims Easily Satisfy the Four Elements of Primary Jurisdiction.**

        **i.**     **The adequacy of streaming video providers' subtitling is a novel issue requiring resolution.**

*First*, as in *Time Warner* and *Zulauf*, Cullen's Complaint presents precisely the sort of issue of first impression that the 21st Century Act empowers the FCC to resolve:  the extent to which federal law requires subtitles in Internet-based streaming videos.  (*Cf.* Compl ¶ 8 [alleging "amount" of subtitled content and "rate" of subtitling insufficient].)  Indeed, Congress expressly recognized the need to articulate legal standards for Internet-based video providers to provide captioning:

> The purpose of [the 21st Century Act] is to update the communications laws to help ensure that individuals with disabilities are able to fully utilize communications services and equipment and better access video programming.
>
> . . . .
> Although Congress has previously acted to ensure access to communications devices by people with disabilities, these laws were last updated in 1996.  Since that time, the communications marketplace has undergone a fundamental transformation, driven by growth in broadband.  Internet-based and digital technologies are now pervasive, offering innovative and exciting ways to communicate and share information.
>
> . . . .
> Nevertheless, the extraordinary benefits of these technological advances are sometimes not accessible to individuals with disabilities.

Senate Committee on Commerce, Science and Transportation's Conference Report, S. Rep. No. 111-386, at 1, 2; *see id.*, at 13–14 (updating statute to account for streaming technology); *accord* 47 USC § 613(a)(2)(A) (the FCC "shall revise its regulations to require the provision of closed captioning on video programming delivered using Internet protocol").  Even Cullen concedes the issue is

1   "serious . . . and emblematic of a larger struggle amongst the deaf and hard of

2   hearing struggling to avoid being left behind by mainstream media and culture

3   online."  (Compl. ¶ 11.)

4          ii.      **The FCC has "exclusive jurisdiction" to**
                   **determine adequacy of streaming video**
5                  **closed captioning.**

6          ***Second***, the 21st Century Act Congress expressly delegates the issue of

7   closed captioning streaming content to the FCC:   "The Commission shall have

8   exclusive jurisdiction with respect to any complaint under this section."  47 USC

9   § 613(i); *see Zulauf*, 28 F. Supp. 2d at 1024 (construing identical provision as

10  granting FCC exclusive jurisdiction to regulate closed captioning).  The 21st

11  Century Act's structure confirms the FCC's exclusive jurisdiction by directing the

12  FCC to "revise its regulations to require the provision of closed captioning on video

13  programming delivered using Internet protocol" by, among other things, (1)

14  defining the "video programming distributors" and "video programming providers"

15  subject to regulation, (2) "describ[ing] [distributors' and providers']

16  responsibilities," and (3) establishing a "mechanism to make available to [the

17  distributors and providers] information on video programming subject to the Act on

18  an ongoing basis."  47 USC § 613(a)(2)(A), (c)(2)(D)(iii)–(v).  The statute thus

19  requires the FCC — *alone* — to articulate standards to determine whether

20  streaming video subtitling practices are legally adequate.

21         iii.     **The 21st Century Act creates a**
                   **comprehensive regulatory scheme to**
22                 **regulate closed captioning.**

23         ***Third***, the 21st Century Act creates a comprehensive regulatory scheme.

24         Initially, the Act mandates that closed captioning regulations include cost-

25  benefit analyses, imposed in part by a detailed, 14-month schedule that ensures any

26  regulations account for the "economic[] burden[s]" of compliance.  47 USC

27  § 613(c)(2)(A), (B), (D)(ii); 21st Century Act, § 201(a) & (e), 124 Stat. at 2795

28  (prescribing timeline); *Zulauf*, 28 F. Supp. 2d at 1023 (inferring intent to create

comprehensive scheme from timeline to draft regulations).  To this end, the Act creates the Video Programming and Emergency Access Advisory Committee ("Advisory Committee") — comprising industry representatives and disabled group advocates — whose advise on competing interests raised by regulating closed captioning in streaming video the FCC must consider in drafting and "revis[ing]" regulations.  47 USC § 613(c)(2)(A); *accord* 21st Century Act, § 201(a), (e), 124 Stat. at 2795.  The FCC also retains the power to "exempt" entities from regulation if it "determine[s] that the application of such regulations would be ***economically burdensome***" for the entity.  47 USC § 613(c)(2)(D)(ii) (emphasis added).

Additionally, the 21st Century Act delegated to the FCC the exclusive power to enforce mandatory statutory exemptions for entities attempting to comply with the statute and the FCC's regulations.  Providers of streaming video content "shall be deemed in compliance" if they make a good faith effort at compliance, 47 USC § 613(c)(2)(D)(vi); or commit only a "*de minimis* failure to comply," *id.* § 613(c)(2)(D)(vii) (emphasis added).  If an entity fails to comply with the explicit regulations, the FCC may deem that the entity is nonetheless in compliance by attempting to comply "through alternate means."  *Id.* at § 613(c)(3).

Finally, the FCC has begun formal procedures for implementing the statute — yet another clue into the 21st Century Act's importance.[1]  *Cf. Time Warner Cable*, 523 F.3d at 1115 (FCC's implementation regulation drafting procedure shows that "a uniform regulatory framework to confront this emerging technology is important to federal telecommunications policy.")

---

[1] The FCC is in the process of seeking the Advisory Committee's recommendations.  *E.g.*, FCC, *Video Programming Accessibility Advisory Committee Meeting*, May 5, 2011, available at <http://www.FCC.gov/events/video-programming-accessibility-advisory-committee-meeting> (developing recommendations for closed captioning of streaming video).

1

2

### iv.    The issue requires the expertise of the FCC and uniformity of resolution.

3

*Fourth*, the FCC's expertise in administering telecommunications laws and

the need for regulatory uniformity also compel dismissal.  Only by deferring to the

FCC's expertise and regulatory authority can the Court effectuate the purpose of the

21st Century Act:  to ensure that "individuals with disabilities would gain access to

the devices, programming, content, and applications that became available through

recent technological advances" without stifling "the extraordinary benefits of these

technological advances."  S. Rep. No. 111-386, at 1, 4; *see* 12–14 (describing

updates to account for streaming video).  The FCC's expertise in applying

telecommunications law to new technologies renders it particularly apt for

determining under what circumstances a streaming video provider's closed

captioning practices comply with federal law.  *E.g.*, *North County Commc'ns Corp.*

*v. California Catalog & Tech.*, 594 F.3d 1149, 1162 (9th Cir. 2010) (applying

primary jurisdiction doctrine "[b]ecause we are ill equipped to properly resolve

North County's claim in the absence of a predicate determination from the [FCC].")

The Ninth Circuit thus recognizes that issues coming within the FCC's explicit

regulatory authority, as the issues raised by the Complaint, are especially

appropriate for invoking the primary jurisdiction doctrine, which

> is designed to protect agencies possessing quasi-
> legislative powers and that are actively involved in the
> administration of regulatory statutes.  Charged with the
> administration of the Telecommunications and Federal
> Communications Acts, the FCC is such an agency.

*Time Warner Cable*, 523 F.3d at 1115 (citations and internal quotations omitted).

This Court's consideration of Cullen's Complaint would undermine explicit

provisions of the 21st Century Act.  As noted, Cullen seeks this Court's relief

because, in Cullen's view, Netflix failed to provide closed captioning

1    "meaningfully" or sufficiently quickly.  Cullen's lawsuit ignores (1) the careful

2    balancing of the Advisory Committee and (2) the FCC's determinations on

3    economic burden, good faith, or *de minimus* violation exemptions.  Thus, the

4    Court's adjudication of Cullen's ADA, Unruh Act, and Disabled Persons Act

5    claims would render superfluous the 21st Century Act's institutional balancing

6    mechanisms.  *Cf. TRW Inc. v. Andrews*, 534 U.S. 19, 31, 122 S. Ct. 441, 151 L. Ed.

7    2d 339 (2001) ("a statute ought, upon the whole, to be so construed that, if it can be

8    prevented, no clause, sentence, or word shall be superfluous, void, or

9    insignificant."); *Association to Protect Hammersley v. Taylor Res.*, 299 F.3d 1007,

10   1019 (9th Cir. 2002) (deferring to EPA's interpretation of term "point source"

11   because agency "was given the power under the [statute] to define point sources").

12   As such, Netflix respectfully requests that the Court not sanction Cullen's

13   attempted end-run around the comprehensive statutory scheme by declining to defer

14   to the FCC.

15       **2.    Even the FCC's Without Primary Jurisdiction, the
16              Anti-Discrimination Statutes Do Not Apply.**

17           **a.    The ADA does not apply to Netflix's streaming
18                  video library, which is not an "actual, physical
                    place."**

19           Even if this Court elected to wade into this complex regulatory matter, the

20   Complaint would still fail.  Cullen premises his ADA claim on the theory that

21   "Netflix's streaming video library is a 'place of public accommodation'" as defined

22   by the ADA, and that Netflix denied Cullen access to that "place."  (Compl. ¶ 69

23   (*quoting* 42 USC § 12182).)  Nonsense.  In *Weyer v. Twentieth Century Fox Film

24   Corp.*, 198 F.3d 1104 (9th Cir. 2000) — "existing precedent" that Cullen concedes

25   is controlling (Pl.'s Mot. for Admin. Relief, at 3, ECF No. 8) — the Ninth Circuit

26   explained that § 12181 (defining a "place of public accommodation") precludes

27   non-physical abstractions — such as Netflix streaming videos — from the realm of

28   "actual, physical places" the ADA covers:

1
2
3
4
5
6
7
8
9
10

> Title III provides an extensive list of "public accommodations" in § 12181(7), including such a wide variety of things as an inn, a restaurant, a theater, an auditorium, a bakery, a laundromat, a depot, a museum, a zoo, a nursery, a day care center, and a gymnasium. All the items on this list, however, have something in common. They are ***actual, physical places*** where goods or services are open to the public, and places where the public gets those goods or services. The principle of *noscitur a sociis* requires that the term, "place of public accommodation," be interpreted within the context of the accompanying words, and this context suggests that ***some connection between the good or service complained of and an actual physical place is required***.

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Id.* at 1114 (emphasis added); *accord Torres v. AT&T Broadband, LLC*, 158 F. Supp. 2d 1035, 1038 (N.D. Cal. 2001) (dismissing ADA claim that cable company must make on-screen channel list accessible to the blind; "neither the digital cable system nor its on-screen channel menu can be considered a place of public accommodation within the meaning of the ADA."); *Noah v. AOL Time Warner Inc.*, 261 F. Supp. 2d 532, 544–45 (E.D. Va. 2003) (Internet chat rooms are not "actual physical facilities" and therefore not ADA "place[s] of public accommodation"), *aff'd*, 2004 U.S. App. LEXIS 5495 (4th Cir. Mar. 24, 2004); *Access Now v. Southwest Airlines*, 227 F. Supp. 2d 1312, 1319 (S.D. Fla. 2002) ("this Court cannot properly construe 'a place of public accommodation' to include Southwest's Internet website, southwest.com."). A district court in this Circuit has applied the ADA to a website *only* when it "impede[d] equal enjoyment of goods and services provided by [] ***physical . . . stores***." *National Fed'n of the Blind v. Target Corp.*, 452 F. Supp. 2d 946, 952 (N.D. Cal. 2006). Netflix's streaming video library is not connected with a physical store, so the ADA does not apply.

**b.    The Unruh Act and Disabled Persons Act hinder enforcement of, and are thus preempted by, the 21st Century Act.**

Cullen's claims under the Unruh Act and Disabled Persons Act — which seek unbridled "equal access" to Netflix's streaming video content (Compl. ¶¶ 110, 116) and injunctive relief "remedying the discrimination" (*id.* ¶¶ 113, 118) — flout the 21st Century Act's mandate to balance the need to provide disabled persons' access against economic burden.  As such, "[s]tate law must yield to a congressional Act" where, as here, the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *United States v. Arizona*, No. 10-16645, 2011 U.S. App. LEXIS 7413, *5–6 (9th Cir. Apr. 11, 2011) (Arizona labor law interfered with and was preempted by federal immigration laws); *Qwest Corp. v. Arizona Corp. Comm'n*, 567 F.3d 1109, 1118 (9th Cir. 2009) (Federal Communications Act preempted state law purporting to govern long-distance telephone pricing; "state law [] is pre-empted if it interferes with the methods by which the federal statute was designed to reach this goal."). To determine whether "obstacle preemption" exists, the Court must examine "the federal statute as a whole and identify its purpose and intended effects," and determine whether the state law would interfere with those purposes.  *Arizona*, 2011 U.S. App. LEXIS 7413, at *6.

The relief Cullen seeks under the Unruh Act and Disabled Persons Act would stand as obstacles to the federal 21st Century Act's purpose of balancing closed captioning regulation against implementation burdens.  Cullen wants the Court to enjoin Netflix outright from, and award damages for, providing "inferior" (insufficiently subtitled) streaming video (*e.g.*, Compl. ¶¶ 111, 113, 114, 119, 120), regardless of (1) Netflix's "good faith" efforts to caption its streaming videos or any "economic[] burden[]" it might suffer — two statutorily mandated exemptions from liability under the Act, 47 USC § 613(c)(2)(D); or (2) Congress's interest in national uniformity of standards in Internet-protocol based closed captioning.

Cullen's requested relief would therefore impede Congress's clear intention to balance the costs and benefits of regulating Internet-based subtitling.  That the 21st Century Act requires the Advisory Committee — and not analogous state authorities — to aid the FCC in promulgating regulations confirms that Congress intended to avoid state interference.  *E.g.*, *Qwest Corp.*, 567 F.3d at 1116–17 (preemption appropriate because statutory "structure" of FCC rulemaking mechanism suggests "the FCC possesses sole authority" over the matter).

Because the relief Cullen seeks under the Unruh Act and Disabled Persons Act promises to impede the 21st Century Act, the claims are preempted.[2]

### 3.   Even If the Statutes Apply, Cullen Fails to Allege Facts Showing Discrimination.

Even if the statutes applied (they do not), Cullen has not alleged sufficient facts to pursue his discrimination-based claims.  Cullen premises all three claims on conclusory allegations that Netflix failed "to reasonably modify" (Compl. ¶ 71 [ADA]), or "denied full and equal access to" (*id.* ¶ 111 [Unruh Act], ¶ 117 [Disabled Persons Act]), Netflix's streaming video library by insufficiently subtitling streaming videos.  Aside from unsupported legal conclusions, Cullen leaves his complaint entirely devoid of facts showing Netflix discriminated against hearing impaired individuals (aside from his unsupported platitude that Netflix provided "separate but unequal goods or services," Compl. ¶ 69).  In fact, Cullen's Complaint reveals only that Netflix did *not* treat hearing impaired individuals differently — indeed, he concedes "Netflix has over 2.5 million deaf and hard of

---

[2] The Federal Communications Act's so-called Savings Clause (47 USC § 414) does not save Cullen's Unruh Act and Disabled Persons Act claims because the clause "preserves only those rights that are not inconsistent with" statutory requirements elsewhere in the Federal Communications Act — *not*, as here, statutes like the Unruh Act and Disabled Persons Act that would frustrate Congress's intent. *Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1010–1011 (9th Cir. 2010) (holding state law claims for conversion, unjust enrichment, and interference with prospective economic advantage preempted despite § 414).

hearing members" (*id.* ¶ 15), and that Netflix does subtitle its streaming videos (*id.* ¶¶ 33–40) — both of which facts undermine his claims.

Thus, the Unruh Act and Disabled Persons Act claims fail because those statutes require that Cullen plead that Netflix denied "*equal access*" to its streaming library. *See* Cal. Civ. Code § 51 (Unruh Act) (guaranteeing "*full and equal* accommodations, advantages, facilities, privileges, or services") (emphasis added); *id.* § 54 (Disabled Persons Act) ("Individuals with disabilities or medical conditions have the *same right as the general public* to the full and free use" of goods and services") (emphasis added); *Turner v. Association of Am. Med. Colleges*, 85 Cal. Rptr. 3d 94, 100, 104 (Cal. Ct. App. 2008) (learning-disabled students not entitled to additional testing time: (1) Unruh Act "does not extend to practices and policies that apply equally to all persons," and (2) Disabled Persons Act "does not entitle a disabled individual to greater access than the public at large").

Likewise, the ADA requires Cullen to show Netflix gave non-hearing impaired customers an "unequal benefit" or "separate benefit," or "deni[ed] [] participation" to hearing impaired individuals — none of which Cullen sufficiently alleges. 42 USC § 12182(b)(1)(A); *cf. Weyer*, 198 F.3d at 1115 ("The ordinary meaning of this language . . . does not require provision of different goods or services, just nondiscriminatory enjoyment of those that are provided.") Cullen thus fails to show discrimination and cannot state a claim under the ADA, Unruh Act, or Disabled Persons Act.

### B. Cullen Fails to State a Claim for Violation of Consumer Protection Statutes (the UCL, FAL, and CLRA).

For his remaining causes of action, Cullen asserts Netflix (1) violated (inapplicable) federal regulations, which concern captioning of television programming, not streaming video, Compl. ¶¶ 5, 86–90 (in violation of the UCL's "unlawful" prong); and (2) misrepresented that it would provide captioning that would satisfy Cullen's subjective notion of what is "meaningful" about the

1   subtitling of its streaming video library, Compl. ¶¶ 15–40 (thus "unfair,"

2   "fraudulent," and "unlawful" under the UCL; and a violation of the CLRA).

3   Cullen's claims fail.

### 1. The Consumer Protection Statutes Do Not Apply.

#### a. Cullen lacks standing under the UCL, FAL or CLRA because he did not lose money "as a result of" Netflix's actions.

7   As an initial matter, all Cullen's consumer protection claims fail because

8   Cullen lacks standing to assert them.  The FAL, UCL, and CLRA do not provide a

9   private right of action for Cullen unless he lost money or property "as a result of"

10  Netflix's alleged misconduct — that is, he must allege that Netflix's alleged

11  wrongdoing *caused* whatever damage Cullen claims he suffered.  Cal. Bus. & Prof.

12  Code §§ 17200 & 17204 (requiring injury "*as a result of* a violation of" the UCL);

13  *id.* § 17535 (requiring injury "*as a result of* a violation of" the FAL); Cal. Civ.

14  Code § 1780(a) (requiring "damage *as a result of*" CLRA violation); *see, e.g.*, *Hall*

15  *v. Time Inc.*, 70 Cal. Rptr. 3d 466, 472 (Cal. Ct. App. 2008) ("The phrase 'as a

16  result of' in its plain and ordinary sense means 'caused by' and requires a showing

17  of a causal connection or reliance on the alleged misrepresentation.").

18  Cullen does not allege he lost any money "as a result of" Netflix's alleged

19  misconduct.  Cullen's entire injury claim rests, rather, on the theory that he "*would*

20  have only been willing to pay less, if anything at all," for his Netflix subscription

21  had he known that the streaming library did not meet his expectation of

22  "meaningful" closed captioning.  (Compl. ¶ 51, emphasis added.)  Cullen's

23  conclusory allegation that he would have paid less is belied by the fact that, despite

24  now claiming that Netflix's statements about its streaming video closed captioning

25  are not true, Cullen "considered terminating his subscription" but decided not to (*id.*

26  ¶ 49) — in other words, *he continues to pay for the same subscription he had when*

27  *Netflix made the alleged misrepresentations*.  How could Netflix's alleged

28  misrepresentations have induced Cullen to pay his subscription when, as Cullen

1  concedes, he continues to pay monthly *after* allegedly discovering a falsehood?

2  Nothing is stopping him from cancelling his subscription.  Cullen's Complaint

3  makes plain that he continues to pay his subscription on his own volition, not as a

4  result of Netflix's conduct:  he chooses *not* to cancel his subscription, *not* to switch

5  to a Netflix competitor, or *not* even downgrade.  Cullen fails to raise the prospect of

6  an injury caused by Netflix "above the speculative level," fails to allege causation

7  under the UCL, FAL, and CLRA, and thereby fails to state a claim.  *Bell Atl. v.*

8  *Twombly*, 550 U.S. 544, 555–56; *e.g.*, *Hoffman v. Cingular Wireless, LLC*, No. 06-

9  cv-1021, 2008 U.S. Dist. LEXIS 67573, at *11–12 (S.D. Cal. Sept. 4, 2008)

10  (dismissing UCL and CLRA claim; allegation that defendant's conduct "would []

11  have," but did not, cause injury fails to state claim), *aff'd sub nom.*, *Market Trading*

12  *v. AT&T Mobility, LLC*, 388 Fed. Appx. 707 (9th Cir. 2010).

13                  **b.**        **The CLRA does not apply also because Netflix's**
14                                      **streaming videos do not constitute a "tangible"**
                                      **good or service.**

15          Cullen's CLRA claim fails for the additional reason that Netflix's Internet-

16  based streaming video library does not involve a "good" or "service" — an

17  indispensable requirement of his CLRA claims.  Cal. Civ. Code § 1770(a).

18  Netflix's streaming movies and TV episodes — like insurance, annuities, and credit

19  — are not "tangible chattel[s]," *id.* § 1761(a) (defining "goods"); nor are they

20  "work, labor, [or] services for other than a commercial or business use," *id.*

21  § 1761(b).  Indeed, one court in the Northern District of California recently

22  dismissed a similar claim because "software, like insurance and credit, is an

23  intangible chattel under California law and is therefore not encompassed in the

24  CLRA's definition of 'good,'" and "generally is not a service for purposes of the

25  CLRA," *Ferrington v. McAfee, Inc.*, No. 10-cv-01455, 2010 U.S. Dist. LEXIS

26  106600, at *53, 57 (N.D. Cal. Oct. 5, 2010) — a decision consistent with the

27  California Supreme Court's holding that "electronic transmissions" (such as

28  Netflix's streaming media) are "*in*tangible." *Intel Corp. v. Hamidi*, 71 P.3d 296,

309 (Cal. 2003) (emphasis added); *accord Fairbanks v. Super. Ct.*, 205 P.3d 201,

203 (Cal. 2009) ("Because life insurance is not a 'tangible chattel,' it is not a 'good'

as that term is defined in the [CLRA]."); *Berry v. American Express Publ'g, Inc.*,

54 Cal. Rptr. 3d 91, 93 (Cal. Ct. App. 2007) (dismissing CLRA claim; "the

extension of credit, such as issuing a credit card, . . . does not fall within the scope

of the [CLRA].").

The CLRA claim fails for lack of a "tangible" good or service.

> **2.     Even If the Consumer Protection Statutes Apply, Cullen Fails to State Viable Claims Under Them.**

> > **a.     Cullen fails to state a claim for violation of the UCL's "unlawful" prong.**

Even if he had statutory standing, Cullen's his claims would still fail because

of myriad pleading failures.   For starters, Cullen bases his claim for "unlawful"

business practices under the UCL on two notions:  (a) that Netflix's subtitling of its

*Internet-based streaming videos* somehow violates regulations governing

captioning on *television* (Compl. ¶¶ 86–90); and (b) that violations under his other

causes of action amount to violations under the UCL (even though all his other

claims fail) (Compl. ¶ 85).  Neither claim has merit.

> > > **i.     Cullen's UCL claim premised on violation of 47 CFR § 79.1 fails because it does not apply to streaming video.**

Cullen attempts to invoke the UCL to bootstrap a private cause of action to a

violation of federal regulations under the Communications Act of 1934, 47 CFR §

79.1(a)–(c) (implementing 47 USC § 613, governing closed captioning).  (Compl.

¶¶ 86–90.)  Congress expressly prohibited private causes of action under the

regulation:

> > ***Private rights of actions prohibited.*** Nothing in this section shall be construed to authorize any private right of action to enforce any requirement of this section or any regulation thereunder. The Commission shall have exclusive jurisdiction with respect to any complaint under this section.

1    47 USC § 613(i) (emphasis added).  Cullen's claim fails on that ground alone.  In

2    any event, section 79.1 regulations apply to traditional television captioning — they

3    fall under the prior Communications Act iteration (before Congress enacted the 21st

4    Century Act to direct the FCC to revise these regulations to account for streaming

5    content) — *not* to Netflix's Internet-based streaming video.

6          Section 79.1's plain terms show it does not apply to Internet-based content.

7    The regulations define "video programming" as "[p]rogramming provided by, or

8    generally considered comparable to programming provided by, a television

9    broadcast station that is distributed and exhibited for residential use," and apply the

10   regulations to "distributors" and "providers" of this narrowly defined form of

11   "video programming," *see* 47 CFR § 79.1(a)(1)–(3). The provisions do not equate

12   "video programming" with Internet protocol-based streaming video.  *Id.*

13         The 21st Century Act confirms the regulations do not govern streaming

14   content.  In fact, the Act mandates that the FCC "shall *revise* its regulations" to

15   apply to "video programming delivered using Internet protocol."  47 USC § 613(c)

16   (emphasis added).  If the regulations already covered Netflix's "Internet protocol"-

17   based streaming video, Congress would not require such "revis[ions]."  *Dastar*

18   *Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 35 (2003) ("statutory

19   interpretation that renders another statute superfluous is [] to be avoided"); *cf.*

20   *Wilson v. Marchington*, 127 F.3d 805, 809 (9th Cir. 1997) ("A later legislative act

21   can be regarded as a legislative interpretation of an earlier act and is therefore

22   entitled to great weight in resolving any ambiguities and doubts.").

23         The FCC's history of updates to the regulations is in accord.  The last

24   relevant amendment to any of subsections (a), (b), or (c) of 47 CFR § 79.1 (in

25   2000) explains that the FCC was implementing standards "for the display of closed

26   captions on digital television receivers" — *not* streaming Internet content.  Closed

27   Captioning Requirements for Digital Television Receivers, 65 Fed. Reg. 58,467,

28   58,467, 58,477 (Sept. 29, 2000) (amending § 79.1(a), (c)).  "[V]ideo programming"

was last defined in 1997 — well before streaming video was available to consumers — and the FCC never updated the definition to provide for Internet protocol-based programming.  Closed Captioning of Video Programming, 62 Fed. Reg. 48487, 48493 (Sept. 16, 1997) (amending § 79.1(a)). Any regulations for the precise conduct here — Netflix's Internet protocol-based streaming video content — have yet to be crafted by the FCC.  That the FCC "could have easily" amended its definitions to include Internet-based streaming video underscores that the regulations do not apply.  *Wilson*, 127 F.3d at 809.

Cullen cannot premise a UCL claim on violation of the inapplicable § 79.1.

### ii.   Cullen's UCL claim premised on his other causes of action fails because they fail.

The remainder of Cullen's allegations of "unlawful" conduct depend on statutory violations under Cullen's other causes of action.  (Compl. ¶ 85.)  Because Cullen's other claims fail, his UCL claim premised on "unlawful" acts has no basis and must also fail.  *E.g.*, *Ingels v. Westwood One Broad. Servs., Inc.*, 28 Cal. Rptr. 3d 933, 938 (Cal. Ct. App. 2005) ("If the [underlying] claim is dismissed, then there is no unlawful act upon which to base the derivative [UCL] claim."); *Pantoja v. Countrywide Home Loans, Inc.*, 640 F. Supp. 2d 1177, 1190–1191 (N.D. Cal. 2009) (dismissing UCL claim because court dismissed "all . . . predicate violations").

### b.   Cullen fails to allege facts showing Netflix made misrepresentations violating the UCL's "unfair" or "fraudulent" prongs, the FAL, or the CLRA.

Cullen's remaining UCL, FAL, and CLRA claims all rest on the premise that Netflix made misrepresentations about its streaming video library's closed captioning, all of which "had the effect of conveying to Netflix's deaf and hard of hearing members that Netflix would," in Cullen's mind, "meaningfully subtitle its st[r]eaming library within a reasonable time" (whatever that means).  (Compl. ¶ 31; *see* Compl. ¶¶ 75, 80, 85, 94–95, 99, 104 [alleging misrepresentations violated

1   "unlawful," "unfair," and "fraudulent" prongs of UCL, the FAL, and the CLRA].)

2   All these causes of action fail.

3                    **i.      Netflix did not promise to subtitle its**
                              **streaming video library according to**
4                              **Cullen's conception of "meaningful."**

5          Cullen says Netflix misled him into thinking that Netflix's subtitling would

6   meet his subjective expectation of what is "meaningful," but all six causes of action

7   under the UCL, FAL, or CLRA require that Cullen specifically plead how a

8   misrepresentation was misleading based on *objective* "reasonable consumer"

9   standard.  *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995) (affirming

10  dismissal of UCL, FAL, and CLRA claims because statements promising

11  sweepstakes payout in exchange for purchasing magazine subscription unlikely to

12  deceive "person of ordinary intelligence."); *see Kearns.*, 567 F.3d at 1124 (UCL,

13  FAL, and CLRA claims sounding in fraud must satisfy Rule 9(b) standards).  Under

14  the "reasonable consumer" standard, the statement must have "probably" deceived

15  the members of the general public.  *Id.*  Here, however, that a "reasonable person"

16  would *objectively* interpret a statement Netflix made to mean what Cullen

17  *subjectively* considers "meaningful" makes no sense — particularly given that

18  Cullen's Complaint cannot even articulate what "meaningful" means.  Cullen

19  therefore fails to plead sufficiently that Netflix mislead Cullen to think captioning

20  would be "meaningful" — the basis for his UCL, FAL, and CLRA causes of action.

21                   **ii.     Netflix's alleged "misrepresentations"**
                              **were not false or misleading.**
22
23         In any event, Cullen's allegations about alleged "misrepresentations" do not

24  support his UCL, FAL, or CLRA claims because Cullen does not plead facts

    showing the statements are untrue.  *Consumer Advocates v. Echostar Satellite*
25
    *Corp.*, 8 Cal. Rptr. 3d 22, 29 (Cal. Ct. App. 2003) ("Defendants did not violate any
26
    of the [UCL, FAL, and CLRA] statutes with this representation, because it is
27
    true.").  In fact, Cullen's claims generally arise from three (true) statements.
28

***First***, Netflix stated that it was "develop[ing]" closed captioning for its streaming video services and adding captioned videos to its streaming library. (Compl. ¶¶ 17, 20, 25, 28.)[3]  True.  Indeed, Cullen *concedes* that, since those statements were allegedly made, at least 500 streaming videos and TV episodes contain closed captioning (*id.* ¶ 34), and that Netflix is currently supplementing those movies and episodes at a rate of 2.33 per day (*id.* ¶ 36).

***Second***, Netflix explained that it was unable to "caption content sooner" because of "technical difficulties."  (Compl. ¶ 18.)[4]  As "evidence" that the statement is untrue, Cullen alleges two *different* streaming video providers (YouTube.com and Hulu.com) "had captioned and were captioning substantial content."  (*Id.* ¶ 18.)  So what?  The experience of *other* streaming content providers — whose technologies and captioning tools Cullen does not (and cannot) allege are the same as Netflix's — has nothing to do with whether *Netflix* could "caption content sooner."  Indeed, Cullen *does not* make any allegations that would show Netflix's statements untrue: *e.g.*, that Netflix itself was not experiencing technical difficulties, that closed captioning tools for Silverlight (the end-user program enabling consumers to view Netflix videos) were insufficient at the time, or that Netflix could in fact caption content sooner.

***Third***, Netflix stated that, as of February 2011, "more than 3,500 TV *episodes* and *movies* have subtitles available, representing about 30% of *viewing*," and that Netflix "expect[s] to get to 80% *viewing* coverage by the end of 2011." (Compl. ¶¶ 27, 28, & Ex. A at 34, emphasis added.)  Cullen derides Netflix's

---

[3] Netflix allegedly stated the following: "[c]aptioning is in our development plans" (Compl. ¶ 17); Netflix "will keep the deaf and hard of hearing community apprised of its progress" (*id.* ¶ 20); it "offers [closed captioning] on a growing # of titles" (*id.* ¶ 25); and "More subtitles are being added every week." (*id.* ¶ 28.)

[4] Netflix allegedly stated that "the tools for rendering [closed captioning] in Silverlight . . . are weak or non-existent[.]" (Compl. ¶ 17, quoting *id.* Ex. A at 23.)

1  statements as false and misleading based on his conclusory allegation that, in fact,

2  "only about 6% of Netflix's streaming video *programming* [i.e., about 707 titles]

3  was captioned." (*Id.* ¶ 35; *id.* ¶ 34 ["Netflix's streaming video *programming*

4  includes 11,786 titles."].)

5       Cullen relies on two facially wrong assumptions for this conclusion.

6       <u>Faulty assumption 1: "Titles" are the same as "episodes and movies."</u>  Cullen

7  treats all movie and TV episode "titles" without reference to the number of *episodes*

8  contained within a title.  If, for example, the television show "House" contains 40

9  individual episodes (all captioned), Netflix's "3,500 TV episodes and movies"

10  count would include each of those 40 episodes — a true statement.  By Cullen's

11  subjective (and misleading) measure, Cullen counts "House" as a *single* "*title*," not

12  *40 individual episodes*.  Cullen offers nothing to show that Netflix misrepresented

13  the number of subtitled movies and TV episodes.

14       <u>Faulty assumption 2:  "Programming" means "viewing."</u>  Netflix accurately

15  reports that 30% or 80% "of viewing" is captioned.  This statement means that

16  videos and episodes accounting for 30% or 80% of Netflix's streaming video *usage*

17  contained closed captioning.  Cullen conjures a false statement by suggesting —

18  wrongly — that Netflix stated that some percentage of *all* "programming" (that is,

19  all titles) has closed captioning.  Netflix made no such statement, and again, Cullen

20  alleges no fact showing that Netflix's popularity-based measure was false.

21       Cullen fails to state UCL, FAL, or CLRA claims.

22       **IV.   CONCLUSION.**

23       Netflix respectfully requests the Court dismiss the claims with prejudice.

24  Dated:     June 28, 2011          DAVID F. MCDOWELL
                                      JACOB M. HARPER
25                                    MORRISON & FOERSTER LLP

26                                    By:_____/s/ David F. McDowell_____
                                          David F. McDowell
27                                        Attorneys for Defendant
                                          NETFLIX, INC.
28  1128732