1  DAVID F. MCDOWELL (CA SBN 125806)
2  JACOB M. HARPER (CA SBN 259463)
   MORRISON & FOERSTER LLP
   555 West Fifth Street, Suite 3500
3  Los Angeles, California  90013-1024
   Telephone:  213.892.5200
4  Facsimile:  213.892.5454
   Email:     DMcDowell@mofo.com
5              JacobHarper@mofo.com

6  Attorneys for Defendant
   NETFLIX, INC.
7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                        SAN JOSE DIVISION

11

12  DONALD CULLEN, on behalf of          Case No.     5:11-cv-01199-EJD
    himself and all others similarly
13  situated,
                                         **DEFENDANT NETFLIX, INC.'S**
14              Plaintiff,               **NOTICE OF MOTION AND**
                                         **MOTION TO DISMISS SECOND**
15        v.                             **AMENDED COMPLAINT;**
                                         **STATEMENT OF ISSUES;**
16  NETFLIX, INC.,                       **MEMORANDUM OF POINTS AND**
                                         **AUTHORITIES IN SUPPORT**
17              Defendant.               **THEREOF**

18                                       **[Fed. R. Civ. P. 12(b)(6)]**

19                                       Date:      December 2, 2011
                                         Time:      9:00 a.m.
20                                       Judge:     Hon. Edward J. Davila
                                         Courtroom: 1
21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ..................................................................1

STATEMENT OF ISSUES……………………...........................................3

MEMORANDUM OF POINTS AND AUTHORITIES ..........................................4

I.    INTRODUCTION AND SUMMARY OF ALLEGATIONS ........................4

II.    LEGAL STANDARDS ...............................................................................6

III.    CULLEN FAILS TO STATE CLAIMS FOR VIOLATION OF ANTI-DISCRIMINATION STATUTES (UNRUH ACT AND DISABLED PERSONS ACT) ...........................................................................................6

    A.    The FCC Has Primary Jurisdiction Over the Critical Issue in Cullen's Unruh Act and Disabled Persons Act Claims........................7

        1.    Applicable Law ...............................................................7

        2.    Cullen's Discrimination Claims Easily Satisfy the Four Elements of Primary Jurisdiction...................................9

            a.    The adequacy of streaming video providers' subtitling is a novel issue requiring resolution................9

            b.    The FCC has "exclusive jurisdiction" to determine adequacy of streaming video closed captioning.............10

            c.    The 21st Century Act creates a comprehensive regulatory scheme to regulate closed captioning ...........10

            d.    The issue requires the expertise of the FCC and uniformity of resolution..................................................12

    B.    The FCC's Primary Jurisdiction Aside, the Unruh Act and Disabled Persons Act Hinder Enforcement of, and Are Thus Preempted by, the 21st Century Act ....................................................13

    C.    Even if the Statutes Apply, Cullen Fails to Allege Facts Showing Discrimination.............................................................15

IV.    CULLEN FAILS TO STATE A CLAIM FOR VIOLATION OF CONSUMER PROTECTION STATUTES (THE UCL, FAL, AND CLRA) ....................................................................................................16

    A.    The Consumer Protection Statutes Do Not Apply .............................16

        1.    Cullen lacks standing under the UCL, FAL or CLRA because he did not lose money "as a result of" Netflix's actions ..........................................................................16

        2.    The CLRA does not apply also because Netflix's streaming videos do not constitute a "tangible" good or service ............................................................................18

    B.    Even If the Consumer Protection Statutes Applied, Cullen Fails to State Viable Claims Under Them ...................................................19

        1.    Cullen fails to allege facts showing Netflix made misrepresentations violating the UCL's "unfair" or "fraudulent" prongs, the FAL, or the CLRA ...........................19

# TABLE OF CONTENTS

Page

       a.    Netflix did not promise to subtitle its streaming video library according to Cullen's conception of "meaningful." ............................................................... 19

       b.    Netflix's alleged "misrepresentations" were not false or misleading ............................................. 20

    2.    Cullen fails to state a claim for violation of the UCL's "unlawful" prong ...................................................... 22

V.    CONCLUSION ........................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*All One God Faith, Inc. v. Hain Celestial Group, Inc.*,
No. C 09-03517, 2009 U.S. Dist. LEXIS 115928
(N.D. Cal. Dec. 14, 2009) ...................................................................................... 9

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009) ........................................................................................... 6

*Bell Atl. v. Twombly*,
550 U.S. 544 (2009) .............................................................................................. 18

*Berry v. American Express Publ'g, Inc.*,
54 Cal. Rptr. 3d 91 (Cal. Ct. App. 2007) ............................................................ 18

*Caro v. Procter & Gamble Co.*,
18 Cal. App. 4th 644 (Cal. Ct. App. 1993) .......................................................... 17

*Clark v. Time Warner Cable*,
523 F.3d 1110 (9th Cir. 2008) ..................................................................... *passim*

*Consumer Advocates v. Echostar Satellite Corp.*,
8 Cal. Rptr. 3d 22 (Cal. Ct. App. 2003) .............................................................. 20

*Doe v. Wal-Mart Stores, Inc.*,
572 F.3d 677 (9th Cir. 2009) ................................................................................. 6

*Fairbanks v. Super. Ct.*,
205 P.3d 201 (Cal. 2009) ...................................................................................... 18

*Ferrington v. McAfee, Inc.*,
No. 10-cv-01455, 2010 U.S. Dist. LEXIS 106600 (N.D. Cal. Oct. 5, 2010) ..... 18

*Freeman v. Time, Inc.*,
68 F.3d 285 (9th Cir. 1995) .................................................................................. 19

*Greene v. T-Mobile USA, Inc.*,
No. C07-1563, 2008 U.S. Dist. LEXIS 12605 (W.D. Wash. Feb. 7, 2008) ........ 9

*Hall v. Time Inc.*,
70 Cal. Rptr. 3d 466 (Cal. Ct. App. 2008) ........................................................... 17

*Hoffman v. Cingular Wireless, LLC*,
No. 06-cv-1021, 2008 U.S. Dist. LEXIS 67573 (S.D. Cal. Sept. 4, 2008) ........ 18

*Ingels v. Westwood One Broad. Servs., Inc.*,
28 Cal. Rptr. 3d 933 (Cal. Ct. App. 2005) ........................................................... 22

*Intel Corp. v. Hamidi*,
71 P.3d 296 (Cal. 2003) ........................................................................................ 18

# TABLE OF AUTHORITIES

**Page(s)**

*Kearns v. Ford Motor Co.*,
567 F.3d 1120 (9th Cir. 2009) ........................................................................6, 19

*Krainski v. State ex rel. Bd. of Regents*,
616 F.3d 963 (9th Cir. 2010) ...................................................................................6

*Market Trading v. AT&T Mobility, LLC*,
388 Fed. Appx. 707 (9th Cir. 2010)......................................................................18

*Noah v. AOL Time Warner Inc.*,
261 F. Supp. 2d 532 (E.D. Va. 2003) ...........................................................8, 9, 12

*North County Commc'ns Corp. v. California Catalog & Tech.*,
594 F.3d 1149 (9th Cir. 2010) ...............................................................................12

*Pantoja v. Countrywide Home Loans, Inc.*,
640 F. Supp. 2d 1177 (N.D. Cal. 2009).................................................................22

*Qwest Corp. v. Arizona Corp. Comm'n*,
567 F.3d 1109 (9th Cir. 2009) .........................................................................14, 15

*Telesaurus VPC, LLC v. Power*,
623 F.3d 998 (9th Cir. 2010) .................................................................................15

*TRW Inc. v. Andrews*,
534 U.S. 19 (2001).................................................................................................13

*Turner v. Association of Am. Med. Colleges*,
85 Cal. Rptr. 3d 94 (Cal. Ct. App. 2008)..............................................................16

*United States v. Arizona*,
No. 10-16645, 2011 U.S. App. LEXIS 7413 (9th Cir. Apr. 11, 2011) .............14

*Vess v. Ciba-Geigy Corp. USA*,
317 F.3d 1097 (9th Cir. 2003) .................................................................................6

*Zulauf v. Kentucky Educ. TV*,
28 F. Supp. 2d 1022 (E.D. Ky. 1998)....................................................8, 9, 10, 11

**STATUTES**

47 USC
§ 414.......................................................................................................................15
§ 613................................................................................................................*passim*
§ 613(a)(2)(A)........................................................................................................ 10
§ 613(c)...................................................................................................................21
§ 613(c)(2)(A)........................................................................................................ 11
§ 613(c)(2)(B)........................................................................................................ 11
§ 613(c)(2)(D)........................................................................................................14

# TABLE OF AUTHORITIES

**Page(s)**

§ 613(c)(2)(D)(ii) ........................................................................................11, 12
§ 613(c)(2)(D)(iii) ...............................................................................................10
§ 613(c)(2)(D)(v) ................................................................................................10
§ 613(c)(2)(D)(vi) ...............................................................................................12
§ 613(c)(2)(D)(vii) ..............................................................................................12
§ 613(c)(3) ...........................................................................................................11
§ 613(i) .................................................................................................7, 10, 23

Cal. Bus. & Prof. Code
§ 17200 ................................................................................................................17
§ 17204 ................................................................................................................17
§ 17535 ................................................................................................................17

Cal. Civ. Code
§ 51 ......................................................................................................................16
§ 54 ......................................................................................................................16
§ 1761(a) .............................................................................................................18
§ 1761(b) .............................................................................................................18
§ 1770(a) .............................................................................................................18
§ 1780(a) .............................................................................................................17

Twenty-First Century Telecommunications and Video Accessibility Act,
  Pub. L. No. 111-260, §§ 201 & 202, 124 Stat. 2751 (2010) ......................*passim*

**OTHER AUTHORITIES**

47 CFR
§ 79.1 ................................................................................................................. 23

Fed. R. Civ. P.
9(b) .................................................................................................................6, 19
12(b)(6) ...........................................................................................................1, 6

FCC, *First Report of the Video Programming Accessibility Advisory*
  *Committee on the Twenty-First Century Communications and Video*
  *Accessibility Act of 2010: Closed Captioning of Video Programming*
  *Delivered Using Internet Protocol* (July 13, 2011) ...........................................11

Senate Committee on Commerce, Science and Transportation,
  Conference Report,  S. Rep. No. 111-386 (2010) ........................................10, 12

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on December 2, 2011, or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Edward J. Davila, United States District Judge, Northern District of California, located at the Robert F. Peckham Federal Building, 280 South First Street, San Jose, California 95113, defendant Netflix, Inc. ("Netflix") will, and hereby does, move to dismiss with prejudice each and every cause of action asserted in the Second Amended Complaint ("SAC") of plaintiff Donald Cullen ("Cullen") pursuant to Federal Rule of Civil Procedure 12(b)(6) because the SAC fails to state a claim upon which relief can be granted.  Each of the SAC's eight causes of action, which raise claims under two general theories — (1) anti-discrimination statute violations and (2) consumer protection statute violations — fails for the following reasons:

**Causes of Action Raising Anti-Discrimination Statute Violations:**

The *Unruh Civil Rights Act* ("Unruh Act") claim (Seventh Cause of Action) fails because (1) the FCC has primary jurisdiction under the 21st Century Act to determine the main issue raised by this cause of action; (2) the Unruh Act hinders enforcement of, and is thus preempted by, the 21st Century Act; and (3) even if the Unruh Act applied, the SAC fails to allege facts showing that Netflix violated it.

The *Disabled Persons Act* claim (Eighth Cause of Action) fails because (1) the FCC has primary jurisdiction under the 21st Century Act to determine the main issue raised by this cause of action; (2) the Disabled Persons Act hinders enforcement of, and is thus preempted by, the 21st Century Act; and (3) even if the Disabled Persons Act applied, Cullen fails to allege facts showing that Netflix violated it.

**Causes of Action Raising Consumer Protection Statute Violations:**

The *Unfair Competition Law* ("UCL") claims (First through Third Causes of Action, for "unfair," "fraudulent," and "unlawful" practices, respectively) all fail because (1) Cullen lacks statutory standing under the UCL by failing to allege

1   Netflix caused any injury; and (2) the SAC fails to allege facts showing Netflix
2   committed an unfair, fraudulent, or unlawful business practice.

3   The ***False Advertising Law*** ("FAL") claim (Fourth Cause of Action) fails
4   because (1) Cullen lacks statutory standing under the FAL by failing to allege
5   Netflix caused any injury, and (2) the SAC fails to allege facts showing Netflix
6   made a false or misleading statement likely to deceive the public.

7   The ***Consumer Legal Remedies Act*** ("CLRA") claims (Fifth and Sixth
8   Causes of Action — respectively, for injunctive relief and restitution, and for
9   damages) fail because (1) Cullen lacks standing under the CLRA by failing to
10  allege Netflix caused any injury, (2) Cullen lacks standing because his claims do
11  not involve a "tangible" good or service, and (3) the SAC fails to allege facts
12  showing Netflix made a false or misleading statement likely to deceive the public.

13  This Motion is based on this Notice of Motion and Motion, Netflix's
14  Statement of Issues, Netflix's supporting Memorandum of Points and Authorities,
15  and the records in this Action.

16
17
18
19
20
21
22
23
24
25
26
27
28

## STATEMENT OF ISSUES

***Discrimination-Based Claims* (7th & 8th Causes of Action):**

1.    Does the Primary Jurisdiction doctrine compel dismissal of Unruh Act and Disabled Persons Act claims when Congress gave the FCC exclusive jurisdiction to address captioning of Internet-based streamed video?  (Yes.) (*See* Part III.A.)

2.    Would a broad grant of injunctive relief under the Unruh Act and Disabled Persons Act, which would ignore the FCC's determination of factors mandated by the 21st Century Act, hinder enforcement of — and thus be preempted by — the 21st Century Act and fail to state claims?  (Yes.) (*See* Part III.B.)

3.    If a complaint concedes a defendant offered all customers equal access to its streaming videos, does the it fail to state a claim for discrimination under the Unruh Act and Disabled Persons Act?  (Yes.) (*See* Part III.C.)

***Consumer Protection-Based Claims* (1st–6th Causes of Action):**

4.    Does a plaintiff who concedes he did not lose money or property "as a result of" a defendant's conduct, but rather by his own decisions not to stop purchasing a subscription, lack standing to assert claims under the UCL, FAL, and CLRA and fail to state a claim?  (Yes.) (*See* Part IV.A.1)

5.    Does Internet-based streaming video fail to qualify as a "tangible" good or service under the CLRA and fail to state a claim under it?  (Yes.) (*See* Part IV.A.2.)

6.    Do UCL, FAL, or CLRA causes of action premised on alleged misrepresentations — whose truth the complaint concedes — fail to state claims?  (Yes.) (*See* Part IV.B.1.)

7.    Do allegations premised on violation of statutes that do not prohibit the alleged conduct fail to state a claim for "unlawful" conduct under the UCL? (Yes.) (*See* Part IV.B.2.)

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.      INTRODUCTION AND SUMMARY OF ALLEGATIONS.

What happens when an online merchant, with no obligation to do so, voluntarily changes its product content to address customer suggestions?

A lawsuit — for not making the changes fast enough.

That's what happened to defendant Netflix, which (according to the SAC), in 2008, began offering a cheaper, more convenient alternative to its well-known traditional DVD-by-mail video rental service:  an Internet-based streaming video plan with which, for a small fee, customers could view unlimited movies and TV episodes online.  (SAC ¶¶ 6–7, 15–16.)  In response to requests for closed captioning by hearing-impaired customers, Netflix began subtitling its streaming videos — though, given the technical difficulties of captioning streaming content, Netflix explained to customers that it could not yet offer subtitles for all its content. (*Id.* ¶¶ 16, 17, Ex. A at 23.)  Netflix therefore announced that, over several years, it would gradually offer more captioned content to its streaming library as technology permitted.  (*Id.* ¶¶ 17, 20, 22, 23, 25.)  Netflix did not set a deadline for closed captioning its streaming content, nor did it promise that it would be able to caption all its content; to the contrary, as the SAC concedes, Netflix made significant progress in subtitling its videos:  by 2011, it had increased to over 3,500 the total number of subtitled streaming videos and TV episodes (*id.* ¶ 27), and raised by *370*% the rate it subtitles those streaming videos (*compare id.* ¶ 37 [.64 videos captioned per day since 2008] *with id.* ¶ 36 [2.33 per day today]).

Despite Netflix's efforts, plaintiff Cullen, a hearing-impaired Netflix subscriber, filed this class action because, he says, Netflix is not subtitling its streaming video fast enough, or in a manner he subjectively deems "meaningful." (SAC ¶¶ 33–40.)  Having previously filed two complaints with identical claims to those he makes here, Cullen filed the Second Amended Complaint (erroneously

titled "First Amended Complaint"), which settles on eight causes of action based on two meritless theories:

- **Discrimination Theory (7th and 8th Causes of Action).** For his primary theory, Cullen alleges Netflix discriminated against hearing-impaired individuals by not captioning its streaming video library at a rate Cullen considers "meaningful" (in violation of California's Unruh Civil Rights Act, SAC ¶¶ 103–107 [7th Cause of Action ("COA")]; and California's Disabled Persons Act, *id.* ¶¶ 108–112 [8th COA]).

- **Consumer Protection Theory (1st–6th Causes of Action).** Cullen's second theory asserts Netflix violated consumer protection statutes by misrepresenting that it would "meaningfully subtitle" its streaming videos "within a reasonable time period" (in violation of the UCL, SAC ¶¶ 72–76 [1st COA, "unfair" prong], ¶¶ 77–81 [2d COA, "fraudulent" prong], ¶¶ 82–86 [3d COA, "unlawful" prong]); FAL, *id.* ¶¶ 87–90 [4th COA]); and CLRA, *id.* ¶¶ 91–95 [5th COA, equitable relief], ¶¶ 96–102 [6th COA, damages].)

The discrimination claims fail. *First*, Cullen's discrimination claims should be dismissed on primary jurisdiction grounds. Under the 21st Century Act, Congress assigned to the FCC the exclusive authority to decide the precise issue Cullen raises here: the extent to which Internet-based streaming video providers must offer closed captioning. Because Cullen's suit threatens to undermine the 21st Century Act's framework — which entrusts the FCC with exclusive authority to provide reasonable captioning regulations that account for the "economic burden" of implementing captioning — the claims should be dismissed. *Second*, even without primary jurisdiction, the statutes Cullen relies on do not apply: the Unruh Act and Disabled Persons Act hinder enforcement of, and are therefore preempted by, the 21st Century Act. *Third*, on the merits, these causes of action fail because the SAC does not allege facts showing Netflix discriminated against hearing-impaired individuals.

The consumer protection claims also fail.  *First*, Cullen lacks standing:  (a) all six causes of action fail because he did not lose money (his Netflix subscription fee) "as a result of" Netflix's wrongdoing — in fact, Cullen continues to subscribe *regardless of*, not because of, Netflix's alleged conduct; and (b) his CLRA claims fail for the additional reason that the SAC concerns software, not a "tangible" good or service.  *Second*, regardless of standing, Cullen's claims fail on the merits:  (a) his UCL, FAL and CLRA claims — all premised on misrepresentation — fail because the SAC fails to assert allegations showing they were not true; and (b) his claim under the "unlawful" prong of the UCL fails because Netflix did not violate any law.

Because Cullen cannot cure the defects of his claims in this Second Amended SAC, Netflix respectfully requests the action be dismissed with prejudice.

## II.   LEGAL STANDARDS.

To defeat a motion to dismiss, "a complaint must contain sufficient factual matter to state a facially plausible claim for relief."  *Krainski v. State ex rel. Bd. of Regents*, 616 F.3d 963, 972 (9th Cir. 2010), citing *Ashcroft v. Iqbal*, __ U.S. __, 129 S.Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).  "[C]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss."  *Doe v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 683 (9th Cir. 2009).  Where, as here, a plaintiff alleges a "unified course of fraudulent conduct," the complaint must satisfy Rule 9(b)'s particularity requirement and must allege facts demonstrating "who, what, when, where, and how" of the misconduct, *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) — even if fraud is not an element of any cause of action. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103–04 (9th Cir. 2003).

## III.   CULLEN FAILS TO STATE CLAIMS FOR VIOLATION OF ANTI-DISCRIMINATION STATUTES (UNRUH ACT AND DISABLED PERSONS ACT).

Cullen's primary theory asserts that Netflix discriminates against hearing-impaired customers by not (yet) offering all its streaming videos with subtitling and

1  thereby (1) rendering the streaming plan "effectively unavailable" to hearing-

2  impaired customers by not "meaningfully subtitl[ing]" the streaming videos fast

3  enough (SAC ¶¶ 33–40, 45) but (2) making the plan available for the same price as

4  for non-hearing-impaired customers — "a veritable deaf tax." (SAC ¶¶ 45, 46.)

5  From these threadbare allegations, Cullen divines that Netflix discriminated against

6  hearing-impaired individuals in violation of the Unruh Act and Disabled Persons

7  Act.  All fail as a matter of law.

8      **A.      The FCC Has Primary Jurisdiction Over the Critical Issue
9              in Cullen's Unruh Act and Disabled Persons Act Claims.**

10          **1.      Applicable Law.**

11     At its core, this action asks the Court to resolve a matter that Congress has

12  explicitly delegated to the FCC under the 21st Century Act, which delegates

13  exclusively to the FCC the authority to decide the precise issue in Cullen's SAC:

14  the legal sufficiency of a website's efforts to subtitle its Internet-based streaming

15  video content.  *See* Twenty-First Century Telecommunications and Video

16  Accessibility Act, Pub. L. No. 111-260, §§ 201 & 202, 124 Stat. 2751, codified in

17  part at 47 USC § 613 (2010); *id.* § 613(i) ("The Commission shall have exclusive

18  jurisdiction with respect to any complaint under this section.")

19     As such, dismissal under the primary jurisdiction doctrine is warranted.

20  Under this doctrine, courts dismiss suits in deference to agencies charged with

21  regulating the conduct at issue where, as here, the complaint presents

22          (1) [a] need to resolve an issue that (2) has been placed
23          by Congress within the jurisdiction of an administrative
24          body having regulatory authority (3) pursuant to a statute
25          that subjects an industry or activity to a comprehensive
            regulatory authority that (4) requires expertise or
            uniformity in administration.

26

27

28

1    *Clark v. Time Warner Cable*, 523 F.3d 1110, 1115–16 (9th Cir. 2008) (dismissing

2    complaint because FCC had primary jurisdiction to consider whether a cable

3    provider violated federal and state law) (internal citations and quotations omitted).

4        Cullen's SAC plainly compels dismissal.  *Zulauf v. Kentucky Educ. TV*, 28 F.

5    Supp. 2d 1022 (E.D. Ky. 1998), a case virtually identical to this one, dismissed a

6    discrimination action (under the ADA, the federal analogue of the Unruh and

7    Disabled Persons Acts) alleging a television station discrimination against deaf

8    viewers (as here) "by failing to provide closed captioning for all of its programs."

9    *Id.* at 1023.   In light of the Video Programming Accessibility Act  of 1996 (the

10   21st Century Act's predecessor) (the "1996 Act"), which delegated to the FCC

11   authority to promulgate regulations for closed captioning of television

12   programming, the court dismissed the claims in deference to the FCC — largely for

13   the reasons articulated by the Ninth Circuit:  (1) the issue was evidently important

14   enough for Congress to create a specific statutory scheme for it (*i.e.*, the 1996 Act),

15   *id.* at 1023; (2) the FCC had "exclusive jurisdiction" over closed captioning

16   regulations, *id.* at 1024; (3) the 1996 Act provided a comprehensive scheme

17   "addressing a broadcaster's duty to provide closed captioning for its video

18   programming," *id* at 1023; and (4) "the FCC ha[d] expertise" in broadcasting and

19   captioning and the 1996 Act "was to promote uniformity," *id.* at 1023.

20        Replacing only the name of the statute ("21st Century Act" for the 1996 Act)

21   underscores that the core rational of *Zulauf* maps perfectly onto this case — both of

22   which require dismissal under the primary jurisdiction doctrine because

23          the [21st Century Act] is the latest and most specific

24          statute addressing a [streaming video provider's] duty to
             provide closed captioning for its video programming, and

25          the Court is merely honoring Congress's intent to allow
             the FCC to address any complaints under the statute.

26          Additionally, Congress's intent in giving the FCC
             exclusive jurisdiction over any complaints filed under the

27          [21st Century Act] was to promote uniformity in the area

28

of closed captioning, and the Court's ruling recognizes this intent. Finally, on this point, the FCC has expertise in the area of broadcasting and has already taken steps to determine how much closed captioning broadcasters can reasonably provide. ***It would be inefficient and a waste of judicial resources for the Court to try and reinvent the wheel and determine the proper rate at which [streaming video providers] should be providing closed captioning for their programming.***

*Zalauf*, 28 F. Supp. 2d at 1023–24 (emphasis added).[1] The reasons for dismissing the NAD Action are even more compelling than in *Zulauf*.

For the reasons below, Netflix respectfully requests that the Court dismiss the discrimination claims in deference to the FCC's primary jurisdiction over them.

### 2. Cullen's Discrimination Claims Easily Satisfy the Four Elements of Primary Jurisdiction.

#### a. The adequacy of streaming video providers' subtitling is a novel issue requiring resolution.

***First***, as in *Time Warner* and *Zulauf*, Cullen's SAC presents precisely the sort of issue of first impression that the 21st Century Act empowers the FCC to resolve:  the extent to which a provider of Internet-based streaming videos must provide closed captioning.  (*Cf.* SAC ¶ 8 [alleging "amount" of subtitled content and "rate" of subtitling insufficient].)  Indeed, Congress expressly recognized the need to articulate legal standards for Internet-based video providers to provide captioning:

---

[1] District courts routinely apply the primary jurisdiction doctrine in similar cases. *E.g.*, *Greene v. T-Mobile USA, Inc.*, No. C07-1563, 2008 U.S. Dist. LEXIS 12605, at *4–10 (W.D. Wash. Feb. 7, 2008) (invoking primary jurisdiction to prevent "conflicting decisions" between court and FCC, and preserve uniformity of regulation); *accord All One God Faith, Inc. v. Hain Celestial Group, Inc.*, No. C 09-03517, 2009 U.S. Dist. LEXIS 115928, at *24–25 (N.D. Cal. Dec. 14, 2009) (primary jurisdiction prevent courts from "assum[ing] . . . regulatory role"  or "impos[ing] standards" Congress intended agency to apply).

> The purpose of [the 21st Century Act] is to update the communications laws to help ensure that individuals with disabilities are able to fully utilize communications services and equipment and better access video programming.

Senate Committee on Commerce, Science and Transportation, Conference Report, S. Rep. No. 111-386, at 1, 2; *see id.*, at 13–14 (updating statute to account for streaming technology); *accord* 47 USC § 613(a)(2)(A) (the FCC "shall revise its regulations to require the provision of closed captioning on video programming delivered using Internet protocol").  Even Cullen concedes the issue is "serious . . . and emblematic of a larger struggle amongst the deaf and hard of hearing struggling to avoid being left behind by mainstream media and culture online."  (SAC ¶ 11.)

> **b.   The FCC has "exclusive jurisdiction" to determine adequacy of streaming video closed captioning.**

*Second*, the 21st Century Act expressly delegates the issue of closed captioning streaming content to the FCC:   "***The Commission shall have exclusive jurisdiction with respect to any complaint under this section.***"  47 USC § 613(i) (emphasis added); *see Zulauf*, 28 F. Supp. 2d at 1024 (construing identical provision as granting FCC exclusive jurisdiction to regulate closed captioning).

The 21st Century Act's structure confirms the FCC's exclusive jurisdiction by directing the FCC to "revise its regulations to require the provision of closed captioning on video programming delivered using Internet protocol" by, among other things, (1) defining the "video programming distributors" and "video programming providers" subject to regulation, (2) "describ[ing] [distributors' and providers'] responsibilities," and (3) establishing a "mechanism to make available to [the distributors and providers] information on video programming subject to the Act on an ongoing basis."  47 USC § 613(a)(2)(A), (c)(2)(D)(iii)–(v).  The statute

1    thus requires the FCC to articulate standards to determine whether streaming video

2    subtitling practices are legally adequate, not a federal court applying state law.

3               c.      **The 21st Century Act creates a comprehensive regulatory scheme to regulate closed captioning.**

4        *Third*, the 21st Century Act creates a comprehensive regulatory scheme.

5        As a threshold matter, the 21st Century Act expressly leverages the FCC's

6    expertise to make it better situated than the Court to determine the "effectiveness"

7    and adequacy of Netflix's closed captioning.  For example, the 21st Century Act

8    mandates that closed captioning regulations reflect careful cost-benefit analyses,

9    imposed in part by a detailed, 14-month schedule that ensures any regulations

10   account for the "economic[] burden[s]" of compliance.  47 USC § 613(c)(2)(A),

11   (B), (D)(ii); 21st Century Act § 201(a), (e), 124 Stat. at 2765–68 (prescribing

12   timeline); *Zulauf*, 28 F. Supp. 2d at 1023 (inferring intent to create comprehensive

13   scheme from timeline to draft regulations).

14       To these ends, the 21st Century Act also created the Video Programming and

15   Emergency Access Advisory Committee ("Advisory Committee"), comprising

16   industry representatives and disabled group advocates — including prominent

17   groups representing hearing-impaired individuals — whose membership ensures

18   that the FCC considers their competing interests when drafting and revising

19   regulations.  47 USC § 613(c)(2)(A); *accord* 21st Century Act § 201(a), (e), 124

20   Stat. at 2765.  The FCC has already begun formal procedures for implementing the

21   statute, and half of the Advisory Committee's most recent report for the FCC

22   addresses "Technical Requirements," "Technical Capabilities and Procedures

23   Needed," and "New Developments" concerning regulation of streaming video

24   closed captioning — all drawing on the FCC's superior technical knowledge.[2]  *Cf.*

25

26   _____

27       [2] FCC, *First Report of the Video Programming Accessibility Advisory Committee on the Twenty-First Century Communications and Video Accessibility Act of 2010: Closed Captioning of Video Programming Delivered Using Internet*

28                                                      (Footnote continues on next page.)

1   *Time Warner Cable*, 523 F.3d at 1115 (FCC's implementation regulation drafting

2   procedure shows that "a uniform regulatory framework to confront this emerging

3   technology is important to federal telecommunications policy.").  The Court has no

4   such policy committee to assist it with the complex policy issues raised in the SAC.

5        The 21st Century Act also delegated to the FCC the exclusive power to

6   enforce mandatory statutory exemptions for entities attempting to comply with the

7   statute and the FCC's regulations.  Providers of streaming video content "shall be

8   deemed in compliance" if they make a good faith effort at compliance, 47 USC

9   § 613(c)(2)(D)(vi); or commit only a "*de minimis* failure to comply," *id.*

10   § 613(c)(2)(D)(vii) (emphasis added).  If an entity fails to comply with the explicit

11   regulations, the FCC may deem that the entity is nonetheless in compliance by

12   attempting to comply "through alternate means."  *Id.* at § 613(c)(3).

13        Congress also relies on the FCC and Advisory Committee to leverage their

14   policy-making judgment to craft discretionary "exemptions" that ensure captioning

15   regulations do not impose stifling technological burdens where, as will likely be the

16   case here, the FCC "determine[s] that the application of such regulations would be

17   economically burdensome."  47 USC § 613(c)(2)(D)(ii).

18        In all, the 21st Century Act creates a carefully balanced comprehensive

19   scheme, and interference with it by this lawsuit would undermine it.

20               **d.**    **The issue requires the expertise of the FCC and**

21                     **uniformity of resolution.**

22        ***Fourth***, courts and Congress expressly recognize the FCC's expertise in

23   administering telecommunications laws and the need for regulatory uniformity.

24   The FCC's expertise in applying telecommunications law to new technologies

25   _____

26   (Footnote continued from previous page.)

27   *Protocol* (July 13, 2011) at 16–30, http://transition.fcc.gov/cgb/dro/VPAAC/First_
  VPAAC_Report_to_the_FCC_7-11-11_FINAL.pdf.

28

1   renders it particularly apt for determining under what circumstances a streaming

2   video provider's closed captioning practices comply with federal law.  *E.g.*, *North*

3   *County Commc'ns Corp. v. California Catalog & Tech.*, 594 F.3d 1149, 1162 (9th

4   Cir. 2010) (applying primary jurisdiction doctrine "[b]ecause we are ill equipped to

5   properly resolve North County's claim in the absence of a predicate determination

6   from the [FCC].")  The Ninth Circuit thus recognizes that issues coming within the

7   FCC's explicit regulatory authority, as the issues raised by the SAC, are especially

8   appropriate for invoking the primary jurisdiction doctrine, which

> is designed to protect agencies possessing quasi-
> legislative powers and that are actively involved in the
> administration of regulatory statutes.  Charged with the
> administration of the Telecommunications and Federal
> Communications Acts, the FCC is such an agency.

13  *Time Warner Cable*, 523 F.3d at 1115 (citations and internal quotations omitted).

14          If the Court considered this action now, it would assume the task of engaging

15  in precisely the same policy heavy cost-benefit analysis that Congress delegated to

16  the FCC's exclusive jurisdiction — without the benefit of FCC's expertise or

17  Congress's fail-safes — and would necessarily conflict with, and render

18  superfluous, the 21st Century Act's mandates that the FCC use its technical and

19  policy expertise to address Congress's concerns.  *Cf.* S. Rep. No. 111-386, at 1, 4

20  (noting purpose of act to have FCC address whether "individuals with disabilities

21  would gain access to the devices, programming, content, and applications that

22  became available through recent technological advances" without stifling "the

23  extraordinary benefits of these technological advances."); *TRW Inc. v. Andrews*,

24  534 U.S. 19, 31 (2001) ("a statute ought, upon the whole, to be so construed that, if

25  it can be prevented, no clause, sentence, or word shall be superfluous, void, or

26  insignificant.").

27

28

1   Netflix respectfully requests that the Court not sanction Cullen's attempted

2   end-run around the comprehensive statutory scheme; it should defer to the FCC.

3   **B.     The FCC's Primary Jurisdiction Aside, the Unruh Act and**
         **Disabled Persons Act Hinder Enforcement of, and Are Thus**

4       **Preempted by, the 21st Century Act.**

5   Cullen's Unruh Act and Disabled Persons Act claims — which seek

6   unbridled "equal access" to Netflix's streaming video content and injunctive relief

7   "remedying the discrimination" (SAC ¶¶ 101–104, 109–111) — flout the 21st

8   Century Act's mandate to balance the need to provide disabled persons' access

9   against economic burden.  "State law must yield to a congressional Act," however,

10  where, as here, the state law "stands as an obstacle to the accomplishment and

11  execution of the full purposes and objectives of Congress."  *United States v.*

12  *Arizona*, No. 10-16645, 2011 U.S. App. LEXIS 7413, *5–6 (9th Cir. Apr. 11, 2011)

13  (Arizona labor law interfered with and was preempted by federal immigration

14  laws); *Qwest Corp. v. Arizona Corp. Comm'n*, 567 F.3d 1109, 1118 (9th Cir. 2009)

15  (Federal Communications Act preempted state law purporting to govern long-

16  distance telephone pricing; "state law [] is pre-empted if it interferes with the

17  methods by which the federal statute was designed to reach this goal.").  To

18  determine whether "obstacle preemption" exists, the Court must examine "the

19  federal statute as a whole and identify its purpose and intended effects," and

20  determine whether the state law would interfere with those purposes.  *Arizona*,

21  2011 U.S. App. LEXIS 7413, at *6.

22  The relief Cullen seeks under the Unruh Act and Disabled Persons Act would

23  stand as obstacles to the federal 21st Century Act's purpose of balancing closed

24  captioning regulation against implementation burdens.  Cullen wants the Court to

25  enjoin Netflix outright from, and award damages for, providing "inferior"

26  (insufficiently subtitled) streaming video (*e.g.*, SAC ¶¶ 111, 113, 114, 119, 120),

27  regardless of (1) Netflix's "good faith" efforts to caption its streaming videos or any

28  "economic[] burden[]" it might suffer — two statutorily mandated exemptions from

1   liability under the Act, 47 USC § 613(c)(2)(D); or (2) Congress's interest in

2   national uniformity of standards in Internet protocol-based closed captioning.

3   Cullen's requested relief would therefore impede Congress's clear intention to

4   balance the costs and benefits of regulating Internet-based subtitling.  That the 21st

5   Century Act requires the Advisory Committee — and not analogous state

6   authorities — to aid the FCC in promulgating regulations confirms that Congress

7   intended to avoid state interference.  *E.g.*, *Qwest Corp.*, 567 F.3d at 1116–17

8   (preemption appropriate because statutory "structure" of FCC rulemaking

9   mechanism suggests "the FCC possesses sole authority" over the matter).

10      Because the relief Cullen seeks under the Unruh Act and Disabled Persons

11  Act promises to frustrate the intent of the 21st Century Act, the claims are

12  preempted.[3]

### C.   Even if the Statutes Apply, Cullen Fails to Allege Facts Showing Discrimination.

Even if the statutes applied (they do not), Cullen has not alleged sufficient

facts to pursue his discrimination-based claims.  Cullen premises all three claims on

conclusory allegations that Netflix "denied full and equal access to" Netflix's

streaming video library by insufficiently subtitling streaming videos.  (SAC ¶ 105

[Unruh Act], ¶ 109 [Disabled Persons Act].)  Aside from unsupported legal

conclusions, Cullen leaves his complaint entirely devoid of allegations showing

Netflix discriminated against hearing-impaired individuals (aside from his giant and

unsupported logical leap that because "of Netflix's failure to caption its

---

[3] The Federal Communications Act's so-called Savings Clause (47 USC § 414) does not save Cullen's Unruh Act and Disabled Persons Act claims because the clause "preserves only those rights that are not inconsistent with" statutory requirements elsewhere in the Federal Communications Act — *not*, as here, statutes like the Unruh Act and Disabled Persons Act that would frustrate Congress's intent. *Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1010–1011 (9th Cir. 2010) (holding state law claims for conversion, unjust enrichment, and interference with prospective economic advantage preempted despite § 414).

1    programming," Cullen "was effectively denied access to Netflix's full streaming

2    video library," SAC ¶ 9).  In fact, Cullen's SAC reveals only that Netflix did *not*

3    treat hearing-impaired individuals differently — indeed, he concedes "Netflix has

4    over 2.5 million deaf and hard of hearing members" (*id.* ¶ 15), and that Netflix does

5    subtitle its streaming videos (*id.* ¶¶ 33–40) — both of which undermine his claims.

6        Thus, the Unruh Act and Disabled Persons Act claims fail because those

7    statutes require that Cullen plead that Netflix denied "*equal access*" to its streaming

8    library.  *Turner v. Association of Am. Med. Colleges*, 85 Cal. Rptr. 3d 94, 100, 104

9    (Cal. Ct. App. 2008) (learning-disabled students not entitled to additional testing

10    time:  (1) Unruh Act "does not extend to practices and policies that apply equally to

11    all persons," and (2) Disabled Persons Act "does not entitle a disabled individual to

12    greater access than the public at large"); s*ee* Cal. Civ. Code § 51 (Unruh Act)

13    (guaranteeing "*equal* accommodations, advantages, facilities, privileges, or

14    services") (emphasis added); *id.* § 54 (Disabled Persons Act) ("Individuals with

15    disabilities or medical conditions have the *same right as the general public* to the

16    full and free use" of goods and services") (emphasis added).

17        Cullen thus fails to show discrimination and cannot state a claim under the

18    Unruh Act or Disabled Persons Act.

19        **IV.   CULLEN FAILS TO STATE A CLAIM FOR VIOLATION OF**

20               **CONSUMER PROTECTION STATUTES (THE UCL, FAL, AND CLRA).**

21        For his remaining causes of action, Cullen asserts Netflix misrepresented that

22    it would provide captioning that would satisfy Cullen's subjective notion of what is

23    "meaningful" about the subtitling of its streaming video library, SAC ¶¶ 15–40

24    (thus "unfair," "fraudulent," and "unlawful" under the UCL; and a violation of the

25    CLRA).  Cullen's claims fail.

26

27

28

A.   **The Consumer Protection Statutes Do Not Apply.**

1.   **Cullen lacks standing under the UCL, FAL or CLRA because he did not lose money "as a result of" Netflix's actions.**

As an initial matter, all Cullen's consumer protection claims fail because Cullen lacks standing to assert them. The FAL, UCL, and CLRA do not provide a private right of action for Cullen unless he lost money or property "as a result of" Netflix's alleged misconduct — that is, he must allege that Netflix's alleged wrongdoing *caused* whatever damage Cullen claims he suffered. Cal. Bus. & Prof. Code §§ 17200 & 17204 (requiring injury "*as a result of* a violation of" the UCL); *id.* § 17535 (requiring injury "*as a result of* a violation of" the FAL); Cal. Civ. Code § 1780(a) (requiring "damage *as a result of*" CLRA violation); *see, e.g.*, *Hall v. Time Inc.*, 70 Cal. Rptr. 3d 466, 472 (Cal. Ct. App. 2008) ("The phrase 'as a result of' in its plain and ordinary sense means 'caused by' and requires a showing of a causal connection or reliance on the alleged misrepresentation.").

Here, Cullen does not allege he lost any money "as a result of" Netflix's alleged misconduct. Cullen's entire injury claim rests, rather, on the theory that he "*would* have only been willing to pay less, if anything at all," for his Netflix subscription had he known that the streaming library did not meet his expectation of "meaningful" closed captioning. (SAC ¶ 51, emphasis added.) Cullen's conclusory allegation that he would have paid less is belied by the fact that, despite now claiming that Netflix's statements about its streaming video closed captioning are not true, Cullen "considered terminating his subscription" but decided not to (*id.* ¶ 49) — in other words, *he continues to pay for the same subscription he had when Netflix made the alleged misrepresentations. Cf. Caro v. Procter & Gamble Co.*, 18 Cal. App. 4th 644, 668 (Cal. Ct. App. 1993) (finding alleged misrepresentation that orange juice was "fresh" did not cause damage because plaintiff "did not believe defendants' product to be 'fresh.'") How could Netflix's alleged misrepresentations have induced Cullen to pay his subscription when, as Cullen

1  concedes, he continues to pay monthly *after* allegedly discovering a falsehood?

2  Netflix is not stopping him from cancelling his subscription.  Rather, the SAC

3  makes plain that he continues to pay his subscription on his own volition, not as a

4  result of Netflix's conduct:  he chooses *not* to cancel his subscription, *not* to switch

5  to a Netflix competitor, or *not* even downgrade.  Cullen fails to raise the prospect of

6  an injury caused by Netflix "above the speculative level," fails to allege causation

7  under the UCL, FAL, and CLRA, and thereby fails to state a claim.  *Bell Atl. v.*

8  *Twombly*, 550 U.S. 544, 555–56; *Hoffman v. Cingular Wireless, LLC*, No. 06-cv-

9  1021, 2008 U.S. Dist. LEXIS 67573, at *11–12 (S.D. Cal. Sept. 4, 2008)

10  (dismissing UCL and CLRA claim; allegation that defendant's conduct "would []

11  have" caused injury fails to state claim), *aff'd sub nom. Market Trading v. AT&T*

12  *Mobility, LLC*, 388 Fed. Appx. 707 (9th Cir. 2010).

13          **2.**      **The CLRA does not apply also because Netflix's**
14                         **streaming videos do not constitute a "tangible" good**
                       **or service.**

15        Cullen's CLRA claim fails for the additional reason that Netflix's Internet-

16  based streaming video library does not involve a "good" or "service" — an

17  indispensable requirement of his CLRA claims.  Cal. Civ. Code § 1770(a).

18  Netflix's streaming movies and TV episodes — like insurance, annuities, and credit

19  — are not "tangible chattel[s]," *id.* § 1761(a) (defining "goods"); nor are they

20  "work, labor, [or] services for other than a commercial or business use," *id.*

21  § 1761(b).  Indeed, one court in the Northern District of California recently

22  dismissed a similar claim because "software, like insurance and credit, is an

23  intangible chattel under California law and is therefore not encompassed in the

24  CLRA's definition of 'good,'" and "generally is not a service for purposes of the

25  CLRA," *Ferrington v. McAfee, Inc.*, No. 10-cv-01455, 2010 U.S. Dist. LEXIS

26  106600, at *53, 57 (N.D. Cal. Oct. 5, 2010) — a decision consistent with the

27  California Supreme Court's holding that "electronic transmissions" (such as

28  Netflix's streaming media) are "*in*tangible." *Intel Corp. v. Hamidi*, 71 P.3d 296,

309 (Cal. 2003) (emphasis added); *accord Fairbanks v. Super. Ct.*, 205 P.3d 201, 203 (Cal. 2009) ("Because life insurance is not a 'tangible chattel,' it is not a 'good' as that term is defined in the [CLRA]."); *Berry v. American Express Publ'g, Inc.*, 54 Cal. Rptr. 3d 91, 93 (Cal. Ct. App. 2007) (dismissing CLRA claim; "the extension of credit, such as issuing a credit card, . . .  does not fall within the scope of the [CLRA]."). The CLRA claim fails for lack of a "tangible" good or service.

### B.  Even If the Consumer Protection Statutes Applied, Cullen Fails to State Viable Claims Under Them.

#### 1.  Cullen fails to allege facts showing Netflix made misrepresentations violating the UCL's "unfair" or "fraudulent" prongs, the FAL, or the CLRA.

Cullen's remaining UCL, FAL, and CLRA claims all rest on the premise that Netflix made misrepresentations about its streaming video library's closed captioning, all of which "had the effect of conveying to Netflix's deaf and hard of hearing members that Netflix would," in Cullen's mind, "meaningfully subtitle its streaming library within a reasonable period of time" (whatever that means).  (SAC ¶ 31; *see id.* ¶¶ 74, 79, 88, 93, 98 [alleging misrepresentations violated "unlawful," "unfair," and "fraudulent" prongs of UCL; the FAL; and the CLRA].)  All these claims lack merit.

##### a.  Netflix did not promise to subtitle its streaming video library according to Cullen's conception of "meaningful."

Cullen says Netflix misled him into thinking that Netflix's subtitling would meet his subjective expectation of what is "meaningful," but all six causes of action under the UCL, FAL, or CLRA require that Cullen specifically plead how a misrepresentation was misleading based on *objective* "reasonable consumer" standard.  *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995) (affirming dismissal of UCL, FAL, and CLRA claims because statements promising sweepstakes payout in exchange for purchasing magazine subscription unlikely to deceive "person of ordinary intelligence."); *see Kearns*, 567 F.3d at 1124 (UCL,

1    FAL, and CLRA claims sounding in fraud must satisfy Rule 9(b) standards).  Under

2    the "reasonable consumer" standard, the statement must have "probably" deceived

3    the members of the general public.  *Id.*  Here, however, the notion that a

4    "reasonable person" would *objectively* interpret a statement Netflix made to mean

5    what Cullen *subjectively* considers "meaningful" makes no sense — particularly

6    given that Cullen's SAC cannot even articulate what "meaningful" means.  Cullen

7    therefore fails to plead sufficiently that Netflix mislead Cullen to think captioning

8    would be "meaningful" — the basis for his UCL, FAL, and CLRA causes of action.

9              **b.      Netflix's alleged "misrepresentations" were not
                         false or misleading.**

10        In any event, Cullen's allegations about alleged "misrepresentations" do not

11   support his UCL, FAL, or CLRA claims because Cullen does not plead facts

12   showing the statements are untrue.  *Consumer Advocates v. Echostar Satellite

13   Corp.*, 8 Cal. Rptr. 3d 22, 29 (Cal. Ct. App. 2003) ("Defendants did not violate any

14   of the [UCL, FAL, and CLRA] statutes with this representation, because it is

15   true.").  In fact, Cullen's claims arise from three facially *true* statements.

16        ***First***, Netflix stated that it was "develop[ing]" closed captioning for its

17   streaming video services and adding captioned videos to its streaming library.

18   (Compl. ¶¶ 17, 20, 25, 28.)[4]  True.  Cullen does not allege Netflix was not in the

19   process of developing streaming video methods.  Indeed, Cullen *concedes* that,

20   since those statements were allegedly made, at least 500 streaming videos and TV

21   episodes contain closed captioning (*id.* ¶ 34), and that Netflix is currently

22   supplementing those movies and episodes at a rate of 2.33 per day (*id.* ¶ 36).

23

24

25        [4] Netflix allegedly stated the following: "[c]aptioning is in our development
26   plans" (SAC ¶ 17); Netflix "will keep the deaf and hard of hearing community
     apprised of its progress" (*id.* ¶ 20); it "offers [closed captioning] on a growing # of
27   titles" (*id.* ¶ 25); and "More subtitles are being added every week." (*id.* ¶ 28).

28

---

**Second,** Netflix explained that it was unable to "caption content sooner" because of "technical difficulties." (SAC ¶ 18.)[5]  As "evidence" that the statement is untrue, Cullen alleges two *different* streaming video providers (YouTube.com and Hulu.com) "had captioned and were captioning substantial content." (*Id.* ¶ 18.) So what?  The experience of *other* streaming content providers — whose technologies and captioning tools Cullen does not (and cannot) allege are the same as Netflix's — has nothing to do with whether *Netflix* could "caption content sooner."  Indeed, Cullen does not make *any* allegations that would show Netflix's statements untrue — *e.g.*, that Netflix itself was not experiencing technical difficulties, that closed captioning tools for Silverlight (the end-user program enabling consumers to view Netflix videos) were insufficient at the time, or that Netflix could in fact caption content sooner — notwithstanding that he has had three separate opportunities to do so in each of his complaints.

**Third,** Netflix stated that, as of February 2011, "more than 3,500 TV *episodes* and *movies* have subtitles available, representing about 30% of *viewing*," and that Netflix "expect[s] to get to 80% *viewing* coverage by the end of 2011." (SAC ¶¶ 27, 28, & Ex. A at 34, emphasis added.)  Cullen derides Netflix's statements as false and misleading based on his conclusory allegation that, in fact, "only about 6% of Netflix's streaming video *programming* [i.e., about 707 titles] was captioned." (*Id.* ¶ 35; *id.* ¶ 34 ["Netflix's streaming video *programming* includes 11,786 titles."].)

Cullen relies on two facially wrong assumptions for this conclusion.

Faulty assumption 1: "Titles" are the same as "episodes and movies."  Cullen treats all movie and TV episode "titles" without reference to the number of *episodes* contained within a title.  If, for example, the television show "House" contains 40

---

[5] Netflix allegedly stated that "the tools for rendering [closed captioning] in Silverlight . . . are weak or non-existent[.]" (SAC ¶ 17, quoting *id.* Ex. A at 23.)

1  individual episodes (all captioned), Netflix's "3,500 TV episodes and movies"

2  count would include each of those 40 episodes — a true statement.  By Cullen's

3  subjective (and misleading) measure, Cullen counts "House" as a *single* "*title*," not

4  *40 individual episodes*.  Cullen offers nothing, however, to show that Netflix

5  misrepresented the number of subtitled movies and TV episodes.

6      Faulty assumption 2:  "Programming" means "viewing."  Netflix accurately

7  reports that 30% or 80% "of viewing" is captioned.  This statement means that

8  videos and episodes accounting for 30% or 80% of Netflix's streaming video *usage*

9  contained closed captioning.  Cullen conjures a false statement by suggesting —

10  wrongly — that Netflix stated that some percentage of *all* "programming" (that is,

11  all titles) has closed captioning.  Netflix made no such statement, and again, Cullen

12  alleges no fact showing that Netflix's popularity-based measure was false.

13      Cullen fails to state UCL, FAL, or CLRA claims.

14              **2.    Cullen fails to state a claim for violation of the UCL's**
                       **"unlawful" prong.**

15
16      Even if he had statutory standing, Cullen's claims would still fail because of

17  myriad pleading failures.   For starters, Cullen bootstraps his claim for "unlawful"

18  business practices under the UCL to his other causes of action.  (SAC ¶ 85.)

19  Because Cullen's other claims fail, his UCL claim premised on "unlawful" acts has

20  no basis and must also fail.  *E.g.*, *Ingels v. Westwood One Broad. Servs., Inc.*, 28

21  Cal. Rptr. 3d 933, 938 (Cal. Ct. App. 2005) ("If the [underlying] claim is dismissed,

22  then there is no unlawful act upon which to base the derivative [UCL] claim.");

23  *Pantoja v. Countrywide Home Loans, Inc.*, 640 F. Supp. 2d 1177, 1190–1191 (N.D.

24  Cal. 2009) (dismissing UCL claim because court dismissed "all . . . predicate

25  violations").[6]

26      [6] Cullen also appears to bootstrap his UCL claim to a purported violation of
27  federal regulations under the Communications Act of 1934, 47 CFR § 79.1a)–(c)
28  (implementing 47 USC § 613, governing closed captioning).  (SAC ¶ 5.)

(Footnote continues on next page.)

1   **V.   CONCLUSION.**

2        Netflix respectfully requests the Court dismiss the claims with prejudice.

3   Dated:    October 5, 2011       DAVID F. MCDOWELL
                                   JACOB M. HARPER

4                                      MORRISON & FOERSTER LLP

5                                   By:_____/s/ David F. McDowell_____

6                                       David F. McDowell
                                   Attorneys for Defendant
                                   NETFLIX, INC.

7            1140423

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   ───────────────────────────
   (Footnote continued from previous page.)

24   Nonsense.  Congress expressly prohibited private causes of action under the

25   regulation:  "***Private rights of actions prohibited.*** Nothing in this section shall be

26   construed to authorize any private right of action to enforce any requirement of this
section or any regulation thereunder." 47 USC § 613(i) (emphasis added).  In any

27   event, §79.1 applies to closed captioning of television, not Internet-based streaming

28   videos.